Winston **TALLEY**, William Warren **Hash**, and Vernon Sloan, Petitioners,

v.

Dan D. **STEPHENS**, Superintendent of the Arkansas State Penitentiary, Respondent.

No. PB–65–C–33.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Nov. 15, 1965.

Bruce T. Bullion, Little Rock, Ark., Louis L. Ramsay, Jr., Pine Bluff, Ark., for petitioners.

Bruce Bennett, Atty. Gen., and R. E. Wallin and Fletcher Jackson, Asst. Attys. Gen., of Arkansas, Little Rock, Ark., for respondent.

HENLEY, Chief Judge.

This is a suit in equity brought by three inmates of the Arkansas State Penitentiary, namely Winston Talley, William Warren Hash, and Vernon Sloan, against Dan D. Stephens, Superintendent of that institution, for the purpose of restraining respondent from continuing certain prison practices which petitioners claim are violative of rights secured to them by the 14th Amendment to the Constitution of the United States.[1] Federal subject matter jurisdiction is to be found in 42 U.S.C.A. § 1983.

Petitioners contend, in essence, that they have been unconstitutionally subjected to cruel and unusual punishments, and that they have been denied unconstitutionally access to the Courts to secure redress of their alleged grievances. They do not question the legality of their confinements or claim that they are entitled to release from custody at this time.

Petitioners have been represented most capably by Bruce T. Bullion of Little Rock and Louis L. Ramsay, Jr. of Pine Bluff, appointed by the Court to represent petitioners without charge. The Court is grateful to Messrs. Bullion and Ramsay for their services.

All petitioners assert that they have been denied access to the Courts; Talley and Hash, and Sloan to some extent, contend that they have been subjected to severe corporal punishment which, in the case of Talley, includes alleged unlawful assaults by a fellow inmate, James Pike. Hash and Sloan contend that they have been forced to perform heavy manual labor on the Penitentiary farm which they were not and are not capable of performing. All petitioners complain also that they have been refused needed medical attention.

Respondent denies that Talley is entitled to any relief. Respondent originally took the same position with respect to Hash and Sloan, but now concedes, as will more fully appear, that the Court should enter a decree awarding them some relief.

Following a pre-trial conference held in September of the current year, the case was set for trial to the Court on Monday, October 13. On that date testimony was taken with respect to the Talley petition. The Court heard the testimony of Talley and that of a considerable number of inmate witnesses called by Talley and respondent, respectively. Assistant Warden Mose Harmon, Jr., who has had Talley in charge during much of his incarceration at the Penitentiary, was also heard.[2] Respondent did not testify, but he has made a number of statements in the course of the proceedings which the Court has taken into consideration.

At the conclusion of the hearing on the Talley petition, the Court adjourned the proceedings until November 1, at which time it was planned to take testimony in connection with the applications of Hash and Sloan. However, a few days before November 1 respond-

---

1. Each petitioner tendered a separate petition, but the Court ordered all three petitions consolidated and filed as one case.

2. The Court has been caused some difficulty by the fact that none of the inmate witnesses, including Talley, is particularly worthy of belief, and because of the patent interest of Mr. Harmon whose conduct as Assistant Warden has been called into serious question in the course of the proceedings.

ent filed two documents consenting to the entry of judgments in favor of those two petitioners, and no further evidentiary hearing was held.[3]

Both sides have filed memorandum briefs and both sides have requested or suggested certain specific findings of fact and conclusions of law. All of those requests and suggestions are denied, except to the extent that they are included in this memorandum which incorporates the Court's findings of fact and conclusions of law.

Before discussing the merits some comment in connection with the jurisdiction and function of the Court in a case of this kind is in order.

 Although persons convicted of crimes lose many of the rights and privileges of law abiding citizens, it is established by now that they do not lose all of their civil rights, and that the Due Process and Equal Protection Clauses of the 14th Amendment follow them into the prison and protect them there from unconstitutional administrative action on the part of prison authorities carried out under color of State law, custom, or usage. More specifically, prison authorities are not permitted to inflict upon convicts cruel and unusual punishments for violations of prison rules; they may not discriminate invidiously against a prisoner or class of prisoners; and they may not deny to a prisoner reasonable access to the courts to test the validity of his confinement or to secure judicial protection of his constitutional rights. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030; White v. Ragen, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348; Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034; U. S. ex rel. Knight

v. Ragen, 7 Cir., 337 F.2d 425; McCloskey v. State of Maryland, 4 Cir., 337 F.2d 72; Childs v. Pegelow, 4 Cir., 321 F.2d 487; Roberts v. Pegelow, 4 Cir., 313 F.2d 548; Sewell v. Pegelow, 4 Cir., 291 F.2d 196; Coleman v. Johnston, 7 Cir., 247 F.2d 273; Mason v. Cranor, 9 Cir., 227 F.2d 557; Tabor v. Hardwick, 5 Cir., 224 F.2d 526; Coffin v. Reichard, 6 Cir., 143 F.2d 443, 155 A.L.R. 143. Prior exhaustion of available remedies in the State courts before relief is sought in the federal courts is not required. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

 On the other hand, convicts must be disciplined, and prison authorities must be given wide latitude and discretion in the management and operation of their institutions, including the disciplining of inmates. The Courts cannot take over the management of prisons, and they cannot undertake to review every complaint made by a convict about his treatment while in the prison. Cole v. Smith, 8 Cir., 344 F.2d 721; Snow v. Gladden, 9 Cir., 338 F.2d 999; Sutton v. Settle, 8 Cir., 302 F.2d 286; Williams v. Steele, 8 Cir., 194 F.2d 32, rehearing denied, 194 F.2d 917; Garcia v. Steele, 8 Cir., 193 F.2d 276. It must be recognized also that the administration of prison discipline must in many instances be summary, and that the punishment administered to a convict for a violation of prison rules may differ quantitatively and qualitatively from the punishment prescribed by a criminal statute and imposed initially by a court following an individual's conviction of a crime. See State v. Revis, 193 N.C. 192, 136 S.E. 346, 50 A.L.R. 98.

3. Counsel for petitioners contend that respondent is bound absolutely by the consents to judgment, including concessions made therein. To the extent that the consents concede facts, the respondent is bound by his concessions. The Court, however, in a case of this kind which affects the public interest will not accept legal concessions unless convinced that they are sound, and will not enter any judgment based on an unwarranted or improvident concession. The Court will call attention at this point to the fact that although this suit has not been prosecuted as a class action, it is inevitable that what is decided here with respect to the individual petitioners will have a collateral effect on the future treatment of other inmates.

## I.

■ Taking up first the claims of Hash and Sloan that they have been required to do field work in excess of their physical capabilities, it is conceded, and the Court finds, that both of those men are laboring under serious physical handicaps, that their physical condition has been classified as "poor" by the prison physician; that despite their condition and classification thereof they have been required to engage in work which they are not physically able to perform. They have now been assigned to light work. Respondent has consented that injunctive relief should be granted to Hash and Sloan in this area, and such relief will be granted.

■ In this connection the Court has no difficulty with the proposition that for prison officials knowingly to compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the Eighth Amendment to the Constitution of the United States as included in the 14th Amendment. See Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed. 2d 758.

## II.

■ Not entirely unrelated to the claim of Hash and Sloan just discussed is the claim of all three petitioners that needed medical assistance has been withheld and that attendance at "sick calls" has been unreasonably restricted.

Proposed Conclusion of Law No. (14) A(b) submitted by petitioners is that respondent should be required to "furnish reasonable medical attention for injuries and disabilities, at all reasonable times, and to permit attendance at sick call at reasonable times * * *." Respondent does not object to the Court drawing that conclusion, and it will be incorporated in the decree to be entered.

## III.

The Court next turns to the most serious complaint of petitioners, namely, the infliction of corporal punishment. As administered at the Penitentiary, that punishment consists of blows with a leather strap five feet in length, four inches wide, and about one-fourth inch thick, attached to a wooden handle or shaft about six inches long. Ordinarily, the punishment is inflicted by the Assistant Warden having in his charge the inmate to be punished. A prisoner who is to be whipped is required to lie down on the ground fully clothed, and the blows are inflicted on his buttocks.

Under governing provisions of Arkansas law control of the Penitentiary is vested in the State Penitentiary Board, which is an honorary board consisting of five members appointed by the Governor of Arkansas. In practice the Board has largely left the administration of the Penitentiary to the discretion of the Superintendent.

Act 76 of 1893, § 62, p. 121, Ark.Stats., 1947, § 46–158, makes it the duty of the Board to prescribe the mode and extent of punishments to be inflicted on convicts for the violation of prison rules, and it is a felony for any Superintendent, subordinate officer or guard having convicts in charge to inflict or cause to be inflicted on any convict any greater or more severe punishment than is prescribed by the Board, and if death results from the infliction of excessive punishment, the person responsible is deemed to be guilty of murder or manslaughter "as the case may be."

It is probably true that corporal punishment has been used at the Penitentiary for many years. However, its use was not formally authorized by the Board, at least as far as the record here reflects, until March 1962. At that time, which was before the commencement of respondent's tenure as Superintendent, the Board adopted a brief resolution authorizing the infliction of corporal punishment whenever in the judgment of the Superintendent it appears that such pun-

ishment is necessary to maintain prison discipline or to enforce respect for Penitentiary policies. The resolution did not prescribe the form of such punishment, or the extent to which it may be employed. Its administration in practice has been described.

There are no written rules or regulations prescribing what conduct or misconduct will bring on a whipping or prescribing how many blows will be inflicted for a given act of misconduct. The punishment is administered summarily, and whether an inmate is to be whipped and how much he is to be whipped are matters resting within the sole discretion of the prison employee administering the punishment, subject to the present informal requirement of respondent that the blows administered for a single offense shall not exceed ten.

Adult male inmates of the Penitentiary are confined at either Cummins Farm Unit, where petitioners are incarcerated, or at the smaller Tucker Farm Unit. As their names imply, the primary activity carried on at those farms is agriculture. Large quantities of food are produced for consumption by inmates of the Penitentiary and of other State institutions. In addition, field crops are produced for marketing.

The actual physical labor incident to the farming operations is performed by convicts, known as "rankers," who work ordinarily ten hours a day, six days a week without pay. The rankers, including petitioners, are guarded by other convicts known as "trusty guards," armed with shotguns, pistols, and high powered rifles. Those guards are frequently hardened criminals themselves.

The rankers are assigned to work squads known as "long lines;" each long line is under the supervision of an Assistant Warden who is a paid employee of the State. In addition, each line has assigned to it a trusty guard known as a "line rider." He performs not only a security function but also has some supervisory authority over the rankers, at least in the absence of the Assistant Warden.

The number of paid employees of the Penitentiary, in addition to the Superintendent, is very few. Since the Penitentiary farms have very little direct labor expense, they are entirely self-supporting and ordinarily show annual profits, if the value of the convict labor employed be disregarded.

Certain of the crops produced at the Penitentiary, including cotton and cucumbers, are harvested by hand. The amount of such a crop which an inmate will harvest during a given work period depends not only upon his physical condition, skill, and dexterity, but also upon his diligence and willingness to work. Those same factors influence both the quantity and quality of work performed.

No individual convict has set for him in advance a quota of work which he is expected to perform within a given time. A convict is expected to do "the best he can," and if his performance is not satisfactory to his Assistant Warden, he may be whipped. Here again the infliction of punishment is determined upon and administered summarily.

Petitioner Talley has been whipped on a number of occasions by Assistant Warden Harmon both for infractions of discipline and for insufficient work. Hash has been whipped at least once by Assistant Warden Chadick.

The evidence is sharply conflicting as to how many times Talley has been whipped since he came to the Penitentiary about 1961. He says that he has been whipped about 70 times. Harmon says that Talley has been whipped only six or seven times. Talley probably exaggerates; Harmon probably minimizes. In the Court's eyes that conflict in the testimony is not material.

The evidence also discloses that on two occasions Talley has been assaulted and beaten by James Pike, the line rider assigned to Talley's long line. Pike, an illiterate, is a convicted murderer serving a sentence for beating to death a warden at the Mississippi County Penal Farm where Pike was formerly confined on a misdemeanor charge.

The evidence is conflicting as to the reasons for the assaults of Pike on Talley and as to the extent of the injuries inflicted upon the latter. Again the Court finds it unnecessary to resolve those conflicts. Regardless of why or how severely Pike beat Talley, the Court finds that the assaults were committed by Pike in his capacity as line rider and were for the purpose of disciplining Talley. In connection with the first beating Talley unquestionably received injuries to his teeth which necessitated the furnishing to him of a partial denture.

Still further disclosed by the evidence is the fact that on occasions Talley has been whipped by Harmon on the report of Pike that Talley had done insufficient work. Pike's reports seem to have been acted upon by Harmon automatically and without investigation.

It is contended by petitioners that the infliction of corporal punishment in any degree and in any circumstances upon an adult human being, either as an initial punishment for crime or as punishment for an infraction of prison discipline by a convict, is abhorrent to the modern mind, and that whatever view of it may have been taken in times past it is today a cruel and inhuman punishment prohibited by the Constitution.

In evaluating that contention it should be said first that in present context it is beside the point whether the use of such punishment is good or bad penology, or whether its infliction is necessary to control Arkansas convicts or to run the Penitentiary efficiently, or whether the Judge of the Court, as an individual, approves of such punishment. The question is whether the use of the strap at the Arkansas Penitentiary is a cruel and unusual punishment in the constitutional sense.

█ The criminal code of Arkansas does not prescribe whipping as a punishment for any crime, and as early as 1884 the Supreme Court of Arkansas deprecated the whipping of convicts and refused to presume that the then Penitentiary Board had authorized it. Werner v. State, 44 Ark. 122. And the inflic-

tion of such punishment has been banned in many jurisdictions. It must be recognized, however, that corporal punishment has not been viewed historically as a constitutionally forbidden cruel and unusual punishment, and this Court is not prepared to say that such punishment is per se unconstitutional. See 18 C.J.S. Convicts § 11; State v. Revis, supra; Balser v. State (Del.), 195 A.2d 757; State v. Cannon (Del.), 190 A.2d 514; United States v. Jones, S.D.Fla., 108 F. Supp. 266, 270.

█ But, the Court's unwillingness to say that the Constitution forbids the imposition of any and all corporal punishment on convicts presupposes that its infliction is surrounded by appropriate safeguards. It must not be excessive; it must be inflicted as dispassionately as possible and by responsible people; and it must be applied in reference to recognizable standards whereby a convict may know what conduct on his part will cause him to be whipped and how much punishment given conduct may produce.

█ The Court finds that those safeguards do not exist at the Arkansas Penitentiary today, and until they are established the further corporal punishment of petitioners must and will be enjoined. It is not the function of the Court to undertake to prescribe appropriate safeguards; that is the function of the Board or of respondent subject to the Board's approval. For the guidance of those in charge of the Penitentiary the Court will say, in a general way, that it has particular trouble with the fact that there is no established schedule of punishments, that punishments are inflicted summarily and by Assistant Wardens who may or may not be men of judgment and temperate nature, and that Talley as an individual has been subjected to physical beatings at the hands of Pike. The Court is also troubled by the fact that the question of whether a convict has produced "sufficient work" during a particular period is left to the subjective judgment of the Assistant Warden, who may, at times, act uncriti-

cally upon the recommendation or report of the line rider.

## IV.

▉ There remains for consideration the complaint of petitioners that they have been denied access to the Courts. The record indicates that prior to the tenure of respondent at the Penitentiary, the authorities of that institution certainly discouraged and perhaps prevented inmates from addressing petitions to the Courts either for the purpose of testing the legality of their confinements or for the redress of grievances within the prison. However, the policy of respondent has been to permit access to the Courts, both State and federal, and at the present time such access is theoretically both adequate and reasonable.[4]

It must be recognized, however, that a theoretical right of access to the Courts is hardly actual and adequate if its exercise is likely to produce reprisals, physical or otherwise, from Penitentiary personnel. And it must be recognized also that a complaint to a Court about physical mistreatment inside the Penitentiary is more apt to produce such reprisals than is a petition whereby a convict simply seeks release from the institution.

The Court regrets to say that the record discloses that reprisals have been visited upon Talley on account of his recourse to this Court and on account of his testimony in support of his claims.

Process in this case was served on respondent on August 6 of the current year. On the evening of that day after work in the fields had been concluded and after the rankers had been confined in their barracks, Pike, who has been

mentioned, and two other inmates, apparently trusties or quasi-trusties, entered the barracks where Talley was confined and assaulted him and certain other prisoners who had been complaining about conditions in the Penitentiary and who refer to themselves as "writ writers."

The evidence also shows that for some days after August 6 the writ writers, including Talley, were put into special squads and were worked under the immediate supervision of a shotgun guard; on one occasion that guard discharged his weapon deliberately into the ground behind one of the working men and in such close proximity to him that a buckshot pellet penetrated the man's cotton sack.

While there is no evidence that respondent personally authorized or knew of the August 6 assaults on Talley and his associates, or that he ordered the formation of the special squads, and while it appears that respondent abolished the squads as soon as he learned of their existence, it does not appear that respondent has ever undertaken to discipline or reprimand the convicts concerned, or that Assistant Warden Harmon was disciplined or reprimanded, at least at the time, although he certainly knew about the special squads.

More serious in the Court's eyes is the treatment which Talley received on the day following his testimony in this case. It is admitted that on the morning of October 14 Talley and the other members of his squad were put to work picking cotton, and that after the work proceeded about 30 minutes Warden Harmon

---

4. In the course of the proceedings respondent stated that it was the policy of the Penitentiary to screen petitions to the Courts for the purpose of preventing inmates from sending out petitions containing obscene, abusive, or otherwise objectionable allegations or statements. The Court pointed out at the hearing on October 13, and repeats now, that while respondent's motive in so screening petitions is understandable and laudable, the wiser course for him to pursue is to permit all petitions for relief to be sent out, regardless of their language or tone, and to leave it to the Courts to protect themselves from improper matter, which they can do. Respondent and his subordinates have the right, of course, and indeed the duty to make sure before sending out a petition that the addressee is in fact a judge or court official, and that the communication is related to a request for judicial relief. But, beyond that the Penitentiary authorities probably should not go.

called Talley out of the long line and administered to him nine blows with the strap.

When that occurrence was reported to the Court, respondent was called upon to make an investigation and submit a report to the Court. In due course respondent submitted sworn statements of Talley and Harmon and of certain other convicts who witnessed the whipping.

According to Talley, Harmon administered the nine blows as a punishment to Talley for "lying in court." Talley says that Harmon stated that he considered that he still "owed" Talley about 25 strokes and that he had just as well "get started right now."

According to Harmon, Talley was whipped for "agitating work-stoppage and insolence." The Harmon version is that he was advised by inmates that Talley was urging his fellows to slow down or refuse to work and was telling them that "the 'people in Little Rock' were on his side and none of them would be punished because the Institution Officials were afraid to do anything." Harmon proceeds to state that on the morning of the 14th the men under his charge "all but quit work and a general rebellion appeared in the making or worse if something was not done to correct it. Talley's attitude was both openly defiant and insolent and, knowing that he was the ring-leader, I called him out of the Line and punished him for the above charges."

Harmon says that the punishment was not inflicted because Talley filed his petition or on account of his testimony. He concedes, however, that in the course of the punishment he remarked that "perhaps it would teach him not to lie in Court."

The affidavits of the inmate witnesses of the whipping to some extent corroborate Talley's version and to some extent corroborate that of Harmon. The truth is hard to determine. The Court thinks it probable that Talley was agitating to some extent, perhaps to an extent sufficient to justify punishment of some

sort. On the other hand, he could not have done very much agitating prior to his whipping, and Harmon concedes that he at least took into consideration Talley's alleged "lying in court."

It was not the function of Harmon to pass upon the question of whether the testimony given by Talley was truthful or otherwise, and it was certainly not the function of Harmon to punish Talley for perjury, if any was committed. Moreover, at the time of the punishment now being discussed it was contemplated that a further hearing would be held in connection with the complaints of Hash and Sloan, and it might well have been expected that Talley would be called upon to give further testimony.

From its observation of the individuals involved the Court thinks that it was foreseeable to a penitentiary superintendent of ordinary prudence and foresight that following the October 13th hearing Talley might engage in some boasting or agitation and, on the other hand, that Harmon or Pike, or both, would visit some reprisal on Talley on account of his testimony. Although both risks were foreseeable, respondent apparently took no steps to prevent the occurrence of either.

██ In view of the events which have been described in this section of this opinion the Court finds itself unable to say that injunctive relief is unnecessary to protect petitioners in their access to the Courts. The granting of such access will be ordered and all reprisals against petitioners should they seek further access to the Courts or on account of their present proceeding will be enjoined.

### V.

The Court does not think that it should bring this opinion to a close without stating that nothing said herein should be construed as a claim that respondent personally is an evil, brutal, or cruel man or that he personally approves of all long standing practices of the penitentiary system. On the contrary, the record in this case reflects that respondent

has undertaken with some success to ameliorate the condition of Penitentiary inmates in a number of areas of prison life. For his efforts in that connection respondent is entitled to a full measure of credit.

■ It is also true that the record does not disclose that respondent authorized or had personal advance knowledge of some of the events mentioned herein. However, it must not be overlooked that respondent is in charge of the Penitentiary and is responsible for the acts of his subordinates, including trusty guards. He is not relieved of that responsibility by personal ignorance of abuses practiced in fields and barracks.

A decree in accordance with the foregoing will be entered.