William King JACKSON, Plaintiff,

v.

O. E. BISHOP, Superintendent of the Arkansas State Penitentiary, Defendant.

Lyle Edward ERNST, Jr., Plaintiff,

v.

O. E. BISHOP, Superintendent of the Arkansas State Penitentiary, Defendant.

Grady W. MASK, Plaintiff,

v.

O. E. BISHOP, Superintendent of the Arkansas State Penitentiary, Assistant Superintendent G. R. Goodwin, and Dr. Gwinn Atnip, Defendants.

Nos. PB–66–C–64, PB–66–C–74 and PB–66–C–99.

United States District Court
E. D. Arkansas,
Pine Bluff Division.

June 3, 1967.

Edward L. Wright, Little Rock, Ark., William S. Arnold, Crossett, Ark., for plaintiffs.

Joe Purcell, Atty. Gen., R. D. Smith, III, Don Langston, Asst. Atty. Gen., Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

OREN HARRIS and GORDON E. YOUNG, District Judges.

These are suits in equity brought under 42 U.S.C.A. § 1983 by three inmates of the Arkansas State Penitentiary against O. E. Bishop, Superintendent of the Penitentiary. The cases first became known to the court through handwritten petitions filed by each of the prisoners seeking various forms of relief. The court allowed the petitions to be filed in forma pauperis and treated each one as a complaint for equitable relief under 42 U.S.C.A. § 1983. Counsel was appointed for the prisoners, and after investigation an amended complaint was filed seeking an injunctive relief and making the cases class actions. Although one of the cases was assigned to Judge Harris and the other two to Judge Young, they were consolidated for trial due to the similarity of the issues presented, and both judges sat as a panel of two for the trial.

The plaintiffs make several alternative claims or contentions for themselves and other prison inmates:

First, they contend that the infliction of corporal punishment in any form constitutes cruel and unusual punishment contrary to the prohibitions of the Eighth Amendment to the United States Constitution as made applicable by the Fourteenth Amendment to the States.

Secondly and alternatively, they contend that the use of the strap or "hide" as a means of punishing inmates in the Penitentiary under any circumstances is cruel and unusual so as to be unconstitutional.

Thirdly, they contend that the imposition of administrative rules or regulations concerning the use of the strap does not make it a constitutionally permissible method of prison discipline.

Plaintiffs' fourth contention is actually twofold: (1) they claim that the rules concerning corporal punishment adopted by the Arkansas State Penitentiary Board do not adequately protect the prisoners from unconstitutional treatment nor do they conform to the requirements that this court set out in the *Talley* [1] decision; and (2) the rules which have been promulgated by the Prison Board have been violated in the administration of corporal punishment upon the inmates.

Finally, each of the plaintiffs contends that although he has some physical impairment which would prevent him from doing the work of an average man, he nevertheless is classified as "average" for prison work purposes, is required to perform difficult physical labor, and is whipped when he fails to perform. Each claims that this is contrary to his constitutional right to due process and equal protection of the law and that it is also unconstitutionally cruel and unusual punishment.

The defendant denies that corporal punishment *per se* or use of the strap as carried out by prison officials is cruel and unusual in the constitutional sense. He relies primarily upon this court's earlier decision in the *Talley* case and upon the rules and regulations adopted by the Penitentiary Board pursuant to that decision. He admits that certain rule violations and other unlawful acts occurred at the Penitentiary but claims that these matters have been remedied by administrative action. Defendant denies that any injunctive relief for these plaintiffs or anyone in their class is necessary or justified.

The court appointed Edward L. Wright of Little Rock and William S. Arnold of Crossett, both highly respected and experienced members of the Arkansas Bar, to represent the plaintiffs without

---

1. Talley v. Stephens, D.C., 247 F.Supp. 683. This is an earlier decision before this court in which inmates of the Arkansas State Penitentiary were complaining about treatment received and constitutional rights being denied. Some of the issues and many of the principles involved are identical with the cases which are now before the court. Therefore we will refer to the *Talley* decision several times throughout this opinion rather than repeat facts and circumstances which are the same in these cases.

charge. They have done so most capably, and the court thanks them for their services.

That the court has jurisdiction and that these are proper cases to be brought under 42 U.S.C.A. § 1983 is not questioned by either party. These matters are fully discussed in the *Talley* decision supra at 686. However, at the outset we want to point out that the court is especially conscious of the limitations of its function in cases of this kind.

██ It is well settled that the administration of state prison discipline is the primary responsibility of state officials, and federal courts have an extremely limited area in which they may act pertaining to the treatment of prisoners confined to state penal institutions. State officials must of necessity have wide discretion and control over disciplinary measures in order to properly maintain the prison system as well as to protect the public. Wright v. McMann, 257 F.Supp. 739 (D.C.N.Y.1966). United States ex rel. Atterbury v. Ragen, 237 F. 2d 953 (7 Cir. 1956). Talley v. Stephens, supra (and cases cited therein). Therefore this court cannot and will not become appellate in nature and review each prison administration decision to punish a prisoner.

However, it is equally well settled that there are exceptions to these rules when special circumstances exist and constitutional rights are involved. See Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030; Childs v. Pegelow, 321 F. 2d 487 (4 Cir. 1963); Ex parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034; Talley v. Stephens, supra.

██ As was said in *Talley*, page 686 of 247 F.Supp., "Although persons convicted of crimes lose many of the rights and privileges of law abiding citizens, it is established by now that they do not lose all of their civil rights, and that the Due Process and Equal Protection Clauses of the 14th Amendment follow them into the prison * * * *"

We feel that the complaints in these cases raise several constitutional questions which merit the court's attention.

In order to understand the issues in their proper perspective, it is necessary to set out some of the facts about, and the recent history of the Arkansas State Penitentiary.

The Arkansas Penitentiary System is under the general supervision of a five-man honorary commission known as the State Penitentiary Board but actual supervision is by them delegated to a Superintendent.

The plant of the System consists of two farms. One is known as Cummins Farm and contains approximately 15,500 acres, with 8,200 acres being under cultivation. Cummins Farm is located near Grady, Arkansas, and normally houses approximately 1,600 inmates; Superintendent O. E. Bishop resides at Cummins Farm. The other farm is known as Tucker Farm and contains approximately 4,500 acres, with approximately 3,000 acres being under cultivation. Tucker Farm is situated at Tucker, Arkansas, and normally houses approximately 275 inmates. Cummins Farm and Tucker Farm are approximately fifty miles apart by highway.

Personnel, other than inmates under sentence, at Cummins Farm consists of the Superintendent and 25 paid employees, with 20 being supervision wardens; and at Tucker Farm consists of an assistant superintendent and five paid employees, but only three supervision wardens. Customarily both farms make use of inmates, called trusties, in supervisory and overseeing capacities in the fields, in the barracks, and as security guards. The primary activity of inmates at both farms is agricultural work with row crops and garden type produce being planted, cultivated and harvested principally by hand labor. A dairy herd and a beef herd are also maintained for food.[2]

---

2. For further information concerning the operation of the prison see Talley v. Stephens, supra at 688.

In the fall of 1965 certain irregularities at the Penitentiary were brought to the court's attention by three inmates who filed suits similar to the ones now before the court. This court, with Judge Henley presiding, heard those cases and rendered its decision in November 1965. Talley v. Stephens, supra. The chief contention of the plaintiffs in those cases was that the use of corporal punishment at the Arkansas State Penitentiary for disciplinary purposes was cruel and unusual and violative of the constitutional rights of the plaintiffs.

The court found that it could not say that corporal punishment *per se* was unconstitutional. It went on to say:

> "But, the Court's unwillingness to say that the Constitution forbids the imposition of any and all corporal punishment on convicts presupposes that its infliction is surrounded by appropriate safeguards. It must not be excessive; it must be inflicted as dispassionately as possible and by responsible people; and it must be applied in reference to recognizable standards whereby a convict may know what conduct on his part will cause him to be whipped and how much punishment given conduct may produce."

Shortly after this decision, the Superintendent of the Penitentiary resigned; and on January 1, 1966, Mr. O. E. Bishop, the present Superintendent, was appointed. On January 10, 1966, the Penitentiary Board through Mr. Bishop promulgated a set of rules and regulations for the Penitentiary which include, *inter alia*, the following rules setting forth the offenses which merit corporal punishment as well as the procedures to be followed in administering such punishment.

> "OFFENSES AND PUNISHMENT:
> "A great part of your time here will be spent in the barracks you are assigned to. Barracks rules and procedure will be posted in the barracks. Your conduct, personal cleanliness and attitude while in the barracks is an important part of your prison record.

> "These major offenses will warrant corporal punishment:"
> (1) Homosexuality.
> (2) Agitation (defined as one who creates turmoil and disturbances).
> (3) Insubordination (resisting authority or refusing to obey orders).
> (4) Making or concealing of weapons.
> (5) Refusal to work when medically certified able to work.
> (6) Participating in or inciting a riot.
> "(7) No inmate shall ever be authorized to inflict any corporal punishment under color of prison authority on another inmate.

> "Punishment shall not, in any case, exceed Ten lashes with the strap, the number of lashes to be administered shall be determined by a Board of inquiry, consisting of at least two officials of the Arkansas State Penitentiary, The Superintendent or Assistant Superintendent, and the head Warden or an associate Warden. The Board of Inquiry will request that the accused inmate appear before the Board and speak in his own behalf. No Punishment will be administered in the field."

(Although these rules were adopted as a result of the *Talley* case, they were never approved by the court.)

Each inmate, as well as the employees of the Penitentiary, was given a copy of the rules and was instructed to become familiar with and understand each of them. New prisoners were similarly instructed.

In August of 1966 Superintendent Bishop became aware of irregularities at the Tucker Prison Farm and requested that the Criminal Investigation Division of the Arkansas State Police conduct an investigation. The investigation disclosed rank violations of the rules by certain of the Prison officials. Shortly thereafter all of the wardens at Tucker Farm were discharged or allowed to resign. Since that time there have been three new assistant superintendents in

charge of Tucker Farm in quick succession, as well as other personnel changes.

Subsequently the Arkansas Legislature through a special commission, as well as the Penitentiary Board, conducted various investigations of the penal system. As a result, many desirable changes have been brought about in the administration of the two farms.

These cases were filed in the fall of 1966 and it was during their preparation for trial that the aforementioned investigations were taking place. Therefore, by the time of the trial many of the activities complained of had ceased and many of the individuals involved no longer were employed by the Penitentiary.

The trial of these cases lasted some three days, in which the court heard testimony from fifteen prisoners, several members and ex-members of the Prison personnel, one doctor, and two expert penologists. Some of the testimony pertained to strappings and other whippings which took place prior to the *Talley* decision in 1965. The court ruled that this testimony would be admitted only for the purpose of showing the background or history and would not be relevant to the type of punishment used in the Prison system since the changes brought about by the *Talley* decision, or more particularly since the rules were promulgated in January of 1966.

The strap which is referred to throughout this opinion is made of leather and is between four and five feet long and four inches wide. This leather is bradded to a wooden handle approximately six inches in length. The strap is about one-fourth inch thick at the end attached to the wooden handle and is gradually tapered toward the end which comes in contact with the person being whipped. The evidence showed that there is more than one strap used at the Penitentiary but all are of approximately the same construction. Some of these straps are depicted in plaintiffs' exhibit No. 4.

*Evidence relating to the petitioners herein.*

The evidence showed that the plaintiff Jackson, age 28, entered the prison in 1963 to serve a five year sentence for burglary. Jackson testified to having been subjected to physical beatings three times since he has been in prison. First, in 1965, James Pike, a trusty and long line rider,[3] (an escapee at the time of this trial) hit him several times with his fist, as well as kicking him two or three times. The testimony was unclear as to what the purpose of this whipping was. In November of 1965 Jackson was whipped with the strap by Captain[4] Harmon, a field warden at the Penitentiary, for not picking enough cotton. He has been whipped only once since the rules were promulgated in January 1966.

On July 29, 1966, Jackson and seven other inmates received eight lashes with the strap for leaving okra in the field. Jackson testified that he was charged by the long line rider with overlooking okra and was taken by Captain Harmon to the office of Clay Smith, Head Warden at Cummins Farm. In the process of conducting a hearing on the matter, Captain Smith informed the inmates of the charges against them and asked if each was familiar with the rules of the Penitentiary. He then asked if anyone would like to make a statement, and Jackson told Captain Smith that he had picked all the okra he could see and that he was having eye problems and needed glasses. Captain Smith called for Jackson's medical record to determine the condition of Jackson's eyes. After checking these records and finding that Jackson had been certified as physically able for normal work, he then sentenced each prisoner to receive eight lashes with the strap. These lashes were administered by Captain Dean, another warden at the

---

3. An inmate trusty assigned to keep check on the work performance in the field being performed by the other inmates.

4. All the wardens, including the Superintendent and the Assistant Superintendent are referred to by the prisoners and Prison personnel as Captain.

Prison. Prisoners were required to lie face down on a concrete floor while Captain Dean administered the licks to the buttocks. Jackson testified that the whipping caused much pain and left his buttocks bruised and sore for a number of days. The prisoners were returned to the field, where they continued to pick okra for the rest of the day without incident.

Further evidence shows that at the time of the whipping Jackson had, and still has, a visual defect of the left eye. There is also a slight variance from normal vision in the right eye but this is within the normal vision for reading. Shortly after the whipping he was taken to the nearby city of Pine Bluff for an eye examination and the examining doctor did not recommend glasses for him.[5]

Plaintiff Ernst is 24 years old and has been in the penitentiary (Tucker Farm) since January 19, 1963. He has received seven whippings during his entire stay. The first three of these were administered before the rules were promulgated. They involve charges of scuffling in the barracks, not working hard enough in the fields, and cursing a trusty guard.

In January of 1966, shortly after the rules were promulgated, Ernst received ten lashes upon a charge of talking back to an overseer known as a yardman.[6] He was called to Assistant Superintendent Bruton's office on the morning following the alleged offense and was told that he was charged with talking back to the yardman, was required to lie face down on the floor, and receive ten licks with the strap. No other wardens or other prison officials were present during the charge or the whipping.

Sometime later in 1966 he received ten licks from Captain Mayes for throwing his hat across the Prison yard. The prisoners are told that they must wear their hats in the field and also that they must care for and not misuse the clothing issued to them. Ernst testified that on this evening as he returned to the barracks from the field he took off his hat and threw it across the Prison yard onto the ground. Upon seeing this, Captain Mayes called him over, took him into the barracks, made him lie down and gave him ten lashes with the strap. There were no other wardens or other prison personnel present at this whipping.

On July 20, 1966, plaintiff Ernst was picking cucumbers in the field and was charged by the long line rider with not working and leaving cucumbers on the vines. Ernst responded by saying that he was working the best he could on the food that was fed him and that he was feeling ill. The rider reported Ernst to Captain Mayes, who took him from the fields to the barracks and gave him ten lashes with the strap. This time Ernst was required to lower his pants and was whipped on the bare buttocks, which he testified cut and bruised him and caused a great deal of pain. There was no hearing or formal charge and there were no other wardens present. Ernst was then returned to the field to continue his work. Some forty-five minutes or an hour later, the long line rider approached Ernst and started picking cucumbers back down the row upon which Ernst had just been working. He picked approximately a half bushel of cucumbers from the area in which Ernst had been working since returning from the first whipping. The rider again reported Ernst to Captain Mayes. Ernst was returned to the barracks and taken to Captain Bruton, who was shown the cucumbers and told what had happened. Captain Bruton instructed Captain Mayes to give Ernst ten lashes. He was again required to lower his pants and lie face down on the concrete floor to receive the licks. Ernst testified that this whipping left large bruises and caused

---

5. Jackson's eye condition will be further discussed later in this opinion.

6. A yardman is an inmate placed in charge of keeping records of whereabouts of inmates and maintenance of order in the inmate barracks.

him to bleed. Captain Bruton was present during this whipping and when it was over he ordered Ernst to stand on the "teeter board" [7] inside the barracks until he was told to get off. Ernst testified that he was required to remain on the teeter board for the rest of the day or about three or four hours. According to Ernst this treatment caused his legs and ankles to swell and ache. He has not been whipped since that day.

Plaintiff Mask is twenty years old and has been in prison since November 12, 1965. He spent his first four and a half months at the Cummins Farm and was then sent to Tucker and has been there since that time. He has received five whippings with the strap since coming to Tucker. The first such whipping was in June of 1966, when he was charged by a long line rider with being the last in the field or working too slow and was taken to Captain Fletcher. Captain Fletcher administered ten licks. One week later he was reported leaving cucumbers in the field. He was taken to Captain Bruton, who told him to get his pants down and lie on the floor. Captain Fletcher gave him ten licks. Plaintiff testified that two months later he was caught putting rotten tomatoes in the box they were using to carry tomatoes from the field where they were being picked. Captain Bruton gave him nine licks for this offense. In September of 1966 he was charged with not picking enough cotton. He testified that he had picked ninety pounds that day. He was taken to Captain Goodwin, the Assistant Superintendent at that time, who sentenced him to six lashes which were administered by Captain Heston. On December 7, 1966, he and several other inmates were charged with sitting down and smoking when they should have been picking cotton. He received eight lashes for this offense and was put in an isolation cell for eight days. While plaintiff was in this cell, he received regular meals, although he was denied his mail privileges and could not purchase anything from the commissary.

Plaintiff Mask also testified concerning an altercation between him and Captain Goodwin sometime in the last of November 1966. Mask said that Captain Goodwin hit him on the chin and then had him brought into the office where he was hit four or five times in the stomach and kicked once. Captain Goodwin testified that he had not hit Mask but merely grabbed him and shook him and pushed him in a corner. The testimony is not clear just why this altercation arose; however, it appears it had something to do with Mask's attitude toward work and his work performance.

Plaintiff Mask also complained that his knee bothers him when he works for long periods of time. This causes him not to be able to do as much work as is required of him. His knee was injured in a tractor accident in 1960 to such an extent that it required surgery to repair. There is some evidence that it might have been re-injured in 1964. However, medical evidence was introduced to show that there were no significant residual effects of the earlier injury and also that there had been no recent re-injury.[8]

The court also heard testimony from twelve other inmates of the Arkansas State Penitentiary, most of which was cumulative to that given by the three named plaintiffs as well as corroborating some of their testimony set out above. These prisoners related the facts surrounding whippings which the various prisoners had received for offenses such as insufficient work, insubordination, and scuffling among prisoners. According to these witnesses, some of

---

7. The teeter board is a device formed by two 2-inch by 4-inch boards, one approximately three and one-half feet in length and the other about eighteen inches long. The two boards are nailed together so that the longer board is on top and also so that nails will protrude from beneath the bottom board. The prisoner is required to stand on the top or longer board and balance himself rocking on the nails and the smaller board.

8. This will be discussed further later in the opinion.

the whippings were administered without a formal hearing, also some hearings were conducted with only one warden present. The general pattern of these whippings as related by the prisoners is that a prisoner is charged by a trusty or other inmate in the capacity of an overseer such as a long line rider or yardman with some infraction of the Penitentiary rules. He is taken to a warden. The warden then takes him before another Penitentiary official and there charges him with a rule infraction. In most cases the prisoner is given a chance to explain his actions; then sentence is handed down. If the prisoner is found guilty and sentenced to a whipping, he is required to lie face down on the floor and receive the lashes on his buttocks. The prisoners claim that the word of the trusty or accusing warden is usually summarily accepted without further investigation or questioning.

The prisoners also testified to certain beatings which inmates had received at the hands of trusties or other inmates in positions of authority. These beatings seem to have no connection with the disciplining of the beaten prisoners; however, testimony showed that yardmen, floorwalkers, and occasionally a night warden have seen these beatings and have not reported the inmates for fighting nor have they tried to interfere with the beatings. Most of this type activity takes place at night in the barracks; however, there were a few instances in which one or two blows were struck in the field.

Investigator H. H. Atkinson of the Criminal Investigation Division of the Arkansas State Police testified as to the facts and circumstances of his investigation of the Tucker Prison Farm in August of 1966. Atkinson's investigation arose out of some alleged violations of the rules involving possession of liquor by some of the inmates. He testified that as his investigation progressed he and his men uncovered various acts of brutality and cruel treatment of the inmates by certain officials and trusties at Tucker Farm. Immediately upon report of his findings to Superintendent Goodwin, all the wardens at Tucker Farm were discharged. Although new personnel was appointed, Atkinson's investigation continued for some twenty-two days. He revealed that he had uncovered such torturous devices as a crank telephone device which was used to electrically shock prisoners, as well as use of the teeter board and strapping upon the bare buttocks. He testified that in the first part of his investigation he witnessed such a strapping of an inmate by Captain Mayes. He further testified that all persons responsible for such treatment have been discharged.

He was later placed in charge of Tucker Farm as Acting Assistant Superintendent during the administrative changes in December of 1966 and January of 1967. He said that he found it necessary to use the strap while he was in charge. He strapped four of twelve prisoners who had been sentenced by a three-man board of inquiry to six lashes because they had picked an insufficient amount of cotton. He was told later by the inmates that they were "trying him to see if he would use the whip." He also said that he got better work from the prisoners after they found out he would use the strap.

Superintendent O. E. Bishop has been Superintendent for the Prison system since January 1, 1966. He testified that when the rules were promulgated he made every effort to make sure that each prisoner had a copy of the rules and understood them. His efforts included reading the rules to the prisoners over a loud speaker system and answering any questions they might have. He instructed all the personnel of the Prison that anyone who was found not following the rules would be fired immediately. He also told the trusties that they would be "ranked" (lose their privileges as trusties) at the first violation of the rules. The evidence showed in fact that some trusties have been ranked and several wardens have been fired because of violations.

He testified that he was not aware of the activities that had taken place at Tucker Farm prior to August of 1966 because his duties required him to spend the largest part of his time at Cummins Farm. He also said that the two farms were fifty miles apart and that he could not leave Cummins to go to Tucker without the wardens at Tucker knowing of his visit beforehand.

Superintendent Bishop said that disciplinary methods other than the use of the strap are also used in the Penitentiary system. These include loss of the few privileges which exist for the prisoners, administrative isolation or solitary confinement, and removal from the plasma program, which is a means by which the prisoners earn money. He said that often prisoners charged with violations of the rules were found not guilty and were not punished. The evidence showed that substantial improvements have been made in the facilities and in the administrative procedure of the Penitentiary system since Mr. Bishop has taken over.

The court heard the testimony of five of the wardens who were discharged or permitted to resign from the staff at Tucker Farm. Captain Clay Smith, Head Warden, and two other wardens at Cummins Farm also testified. These witnesses related the facts and circumstances surrounding each of the whippings complained of in this case. They said that in each case involving a whipping there had been a violation of the rules by the prisoners and except in a few instances (which have been admitted by the defendant) the procedure for the administration of corporal punishment as set out in the rules was followed. They maintained that at all hearings at least two wardens were present. They also said that they treated the whipping of prisoners as just another part of their jobs and had no personal feelings against the prisoners while the whipping was being administered.

Captain Clay Smith testified that he usually sits on the board of inquiry at Cummins Farm and that he always asked the prisoner being charged if he knew of and understood the rules and regulations. He then would ask if the prisoner had anything to say before he decided the case or gave any punishment. Captain Smith said that he could not set a work quota for each inmate because of the many variables involved in the day-to-day work at the Prison. He stated that all the Prison administration asked of the inmates was an honest day's work. Upon being questioned by the court, Captain Smith said that of the 1,600 inmates at Cummins, in 1966 approximately 200 were whipped. He said the great majority of prisoners adjusted satisfactorily to Prison conditions and are never punished. There are some whose conduct is such that discipline in some form becomes necessary. There is a smaller group who are rebellious and, because of their recalcitrance, require repeated disciplinary measures.

The court reconvened some two and a half weeks after the close of the first two days of this hearing to hear the testimony of two expert penologists presented by counsel for the plaintiffs.[9]

James V. Bennett, who was Director of the Federal Prisons from 1937 to 1964, and whose qualifications as an eminent penologist are far too numerous to mention here, gave his views on the use of the whip for disciplinary purposes in a penitentiary. He said that in all the many years in which he was connected with the federal prisons he never used strapping or corporal punishment for disciplinary purposes. He felt that it was brutal and medieval and did no real good. He also testified that to his knowledge only one other state used the whip officially in its penitentiary system. He said that it was possible, however, that other states used it unofficially. He said that he had never visited

---

9. Also, Dr. Dale Alford, an opthalmologist, gave some testimony clarifying a written report he had made earlier to the court concerning his examination of one of the plaintiffs.

the Arkansas Penitentiary System and that he was familiar with it only through discussions with prisoners who had been incarcerated there.

He had read and was familiar with the rules of the Penitentiary. Even if corporal punishment were permitted, it was his opinion that these rules were too indefinite and could be easily circumvented so as to make them ineffective. He said that an inmate should be entitled to a completely objective hearing by a qualified employee whose decision should be approved by a high ranking official in the system before corporal punishment is administered to that prisoner. He also suggested that a cooling-off period should be allowed between the charge and the decision or sentence. He advocated the use of incentives for good behavior rather than punishment.

Mr. Fred Wilkinson, Director of Corrections for the State of Missouri, who is also an eminently qualified penologist with many years of experience in the federal prisons, also testified for plaintiffs. It is his opinion that all forms of corporal punishment should be abolished. He said that he also knew of only one other state that uses the whip officially in disciplining prison inmates. In his experience the most commonly used punishment was forfeiture of good time credits, deprivation of privileges, and administrative separation. He said that if the strap were used, there should be a commission or board to rule on the appropriate discipline rather than just one person. Both he and Mr. Bennett testified at some length as to the type of facilities and the forms of punishment used in the prisons with which they had been connected.

According to Mr. Wilkinson, in the Missouri Prison System there is one paid employee for each four or five prisoners; nationally the average is one paid employee to about seven or eight prisoners. It appears that in Arkansas the ratio is one paid employee to approximately 58 prisoners.

*We now consider the applicable law.*

■ The Eighth Amendment to the Constitution of the United States provides "* * * excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted."* (Emphasis supplied.) Although the prohibitions of this Amendment originally applied only to the federal government, it is now well settled that they apply equally to the States through the due process clause of the Fourteenth Amendment. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758; United States ex rel. Bryant v. Fay, 211 F.Supp. 812 (D.C. N.Y.1962).

The courts have never arrived at a satisfactory definition of "cruel and unusual punishment." As was said recently by the Eighth Circuit, "It is settled doctrine that except in extreme cases the courts may not interfere with the conduct of a prison, with its regulations and their enforcement, or with its discipline. (Citation of authorities.)" However, in the same case the court went on to say, "Unlawful administration can exist where there are aspects of institutional treatment of such character or consequences as to shock general conscience or to be intolerable in fundamental fairness. Such treatment is entitled to be held to be within the ban of the Eighth Amendment as representing cruel and unusual punishment and so constituting unlawful administration of prison sentence." Lee v. Tahash, 352 F.2d 970, 971, 972 (1965). See also Carey v. Settle, 351 F.2d 483 (8 Cir. 1965).

■ The court has weighed the evidence in these cases, along with the arguments and authorities set forth in the excellent briefs of both parties. We think it is fair to say, however, as this court said in *Talley,* "* * * corporal punishment has not been viewed historically as a constitutionally forbidden cruel and unusual punishment." Neither are we willing to say that the use of the strap in and of itself is contrary to the Eighth Amendment's prohibitions.

■ "Every punishment in a sense involves cruelty since it imposes by force conditions at odds with the concept of the freedom of the person from all forms of trespass, and freedom of action. More than this is required to violate the Eighth Amendment." Wright v. McMann, 257 F.Supp. 739, 745 (D.C.N.Y. 1966).

■ This, of course, does not extend to all types of corporal punishment or to unguarded use of the strap. A punishment, like a law, may be constitutional in its bare form and yet be unconstitutionally administered. Certainly proper safeguards against capricious administration are necessary to keep such punishment from violating constitutional standards.

There can be no doubt that the brutal and sadistic atrocities which were uncovered by the investigation of the State Police in August and September of 1966 cannot be tolerated. The court has reference to the use of a telephone shocking apparatus, the teeter board, strapping on the bare buttocks, and other torturous acts of this nature. The defendant admits that these acts were committed but claims that they were carried on without the knowledge or approval of the Superintendent, that they are contrary to the Prison rules as well as the State law, that all personnel responsible for such acts have been discharged, that the offending objects of torture have been disposed of, and that administrative steps have been taken to assure that such acts will not recur.

■ The court commends the actions of the Superintendent, under the supervision of the Prison Board, which have produced more efficient administration and improved standards of discipline, as well as other improvements; however, we feel that the inmates' right to be free of such treatment as disclosed in the testimony cannot depend upon the competence of the administrative personnel which changes from time to time; therefore, these and other actions of this character will be permanently enjoined.

As we have indicated, the court is aware that there has been much improvement in the disciplining of prisoners since the rules were promulgated in January 1966. However, the court finds that the "Rules and Regulations" adopted by the Penitentiary Board January 10, 1966 do not provide the adequate safeguards required by this court in *Talley*.

As an example, they are unnecessarily ambiguous in prescribing the composition of the "board of inquiry" described in the rules. We agree with Dr. Bennett's observation that this portion of the rules is so indefinite as to be easily circumvented. It is obvious from the testimony that experience under these rules has proven this to be true.

The court refers particularly to the convening of hearings in connection with the administration of corporal punishment without a proper "board of inquiry."

■ The court will enjoin the use of the strap as punishment at the penitentiary until proper and adequate safeguards surrounding its use are provided by those in charge of prison administration.

It is neither this court's duty nor its inclination to tell the defendant or the Penitentiary Board what rules should be promulgated in order to comply with the Constitution. However, the court will make these general observations.

First, more than one person's judgment should be required for a decision to administer corporal punishment. This is implicit in the existing rules which require such a decision to be made by a board of inquiry. In this procedure, the accuser should not be counted among those who sit in judgment.

Secondly, that circumvention of the rules and regulations by an official in time of anger is intolerable. Certainly a prisoner charged with a rule violation is entitled to and should be provided with an objectively reasoned, dispassionate

decision as to whether or not he should be punished.

Third, that summary acceptance of one inmate's report on another without further investigation in determining whether punishment should be administered voids the effectiveness of any rules and regulations.

And, finally, it is suggested that the Superintendent or an Assistant Superintendent of the Prison participate in or review any decision to inflict corporal punishment.

The court finds that the evidence is insufficient to sustain the contention of each plaintiff concerning his physical impairment. Each claims that he has been unconstitutionally punished because of failure to do work which he is physically unable to do.

There can be no doubt that as we stated in the *Talley* decision:

" * * * for prison officials knowingly to compel convicts to perform physical labor which is beyond their strength, or which constitutes a danger to their lives or health, or which is unduly painful constitutes an infliction of cruel and unusual punishment prohibited by the 8th Amendment to the Constitution of the United States as included in the 14th Amendment."

However, such a situation does not exist in this case. Upon request of plaintiffs' counsel the court appointed Dr. Dale Alford (an ophthalmologist) to examine plaintiff Jackson's eyes, and Dr. John Hundley and Dr. Charles McKenzie (orthopedic surgeons) to examine plaintiff Mask's knee. Relying upon these doctors' reports, as well as the prison medical records of each plaintiff and the testimony surrounding the incidents concerning the alleged physical impairments, the court can find no merit in these contentions.

An injunction will be issued permanently restraining the defendant and any personnel of the Prison System from:

The use of any such devices as the crank telephone or teeter board; or

The application of any whipping to the bare skin of prisoners.

Such officials are further restrained from the "use of the strap" on any prisoner until additional rules and regulations are promulgated with appropriate safeguards in accordance with this opinion and filed with the Clerk of this court.

An order will be issued in accordance with this opinion.

### DECREE

In accordance with the Memorandum Opinion of the court filed this date, the defendant, O. E. Bishop, Superintendent of the Arkansas State Penitentiary, and any personnel of the Prison System are permanently restrained from:

The use of any such devices as the crank telephone or teeter board; or

The application of any whipping to the bare skin of prisoners.

Such officials are further restrained from the "use of the strap" on any prisoner until additional rules and regulations are promulgated with appropriate safeguards in accordance with said opinion and filed with the Clerk of this court.