**STATE of Iowa, Plaintiff,**

v.

**Bennett CULLISON, Judge of the Fifteenth Judicial District of Iowa, Defendant.**

**No. 53491.**

Supreme Court of Iowa.

Jan. 13, 1970.

Richard C. Turner, Atty. Gen., and David A. Elderkin, Asst. Atty. Gen., for plaintiff.

William C. Hemphill, Clarinda, for defendant.

RAWLINGS, Justice.

This is an original certiorari proceeding, pursuant to our order, on plaintiff's application for review of claimed error by defendant trial court in sustaining a criminal action pretrial motion to suppress evidence.

The factual situation presented is devoid of any substantial conflict.

Following conviction of a felony Terry J. Teeters was committed to the Iowa Men's Reformatory. June 13, 1968, he was paroled under supervision of Officer Darrell Holmes.

At that time Teeters executed an instrument by which he agreed to conduct himself honestly, obey the law, keep reasonable hours, refrain from excessive use of intoxicants, and remain at all times in Montgomery County. With the aid of his parole supervisor Teeters secured employment and living quarters in Red Oak.

July 26, 1968, Holmes was advised that Teeters had not reported for work that morning.

The parole officer then went to the parolee's apartment. Holmes knocked on the door and called Teeters' name for about ten minutes before being permitted to enter. He then saw a room littered with beer cans.

Upon inquiry Teeters stated he overslept, had gone to Pottawattamie County the night before, and on his return there had been "quite a party" in the apartment.

The two men then visited the parolee's employer. On return Holmes found one of the interior apartment doors locked. Teeters then said he did not want that door opened because there was something Holmes should not see.

Having been previously advised regarding recent Page and Montgomery County "break-ins", the supervisor became suspicious.

Teeters then asked Holmes to leave for about an hour. Thereupon the supervisor went to the Red Oak Police Station, obtained a set of master keys, returned to the apartment, and attempted to open the locked door.

The parolee became nervous, again asked that the door be not opened, and picked up a table knife, but made no threats or menacing moves. Holmes, however, became concerned and again went to the station, this time returning with the police chief. Teeters then made some statement to the effect he would be glad when it was over.

The keys were again unsuccessfully tried by Holmes, whereupon Teeters indicated one which would probably work. It did.

The two officers then entered a bedroom where they encountered a closet door, also locked. When Holmes had difficulty in opening that door Teeters pointed out the master key used to enter the bedroom would, in turn, unlock the closet. There Holmes and the police officer found merchandise, later identified as having been stolen from a store in Page County.

As a result of this warrantless search, defendant was charged by county attorney's information with the crime of receiving stolen property. His pretrial motion to suppress was sustained by trial court and the State seeks this review.

I. The broad question presented is: Did trial court here exceed its jurisdiction or otherwise act illegally? Rule 306, Rules of Civil Procedure, and State v. District Court, 248 Iowa 250, 253–254, 80 N.W.2d 555. See also State v. Rees, 258 Iowa 813, 816, 139 N.W.2d 406.

II. Reduced to bare essentials, however, the problem to be resolved is whether Teeters has standing to invoke constitutional prohibitions against a claimed unreasonable warrantless search and seizure.

At the threshold, by way of exclusion, use of evidence so obtained, in connection with revocation of probation, is not now before us.

Rather the issue is whether an Iowa State parolee may effectively challenge evidentiary use of fruits obtained by a parole supervisor's warrant-absent, nonconsent search of the parolee's living quarters in connection with the prosecution of a new and independent criminal action.

This means, in substance, our task is to determine what constitutional rights, if any, an individual surrenders upon conditional release from one of our state penal institutions.

As best we have been able to determine, the question posed has never before been squarely resolved by this or the United States Supreme Court.

However, some other state and federal tribunals have considered and determined the problem upon factual circumstances peculiar to each case.

Probably the most cited is People v. Hernandez, 229 Cal.App.2d 143, 40 Cal. Rptr. 100, 8 A.L.R.3d 1092. There a narcotics agent received information from an informant to the effect Hernandez, a parolee, might have narcotics in his automobile. This tip was relayed to the parolee's supervisor. He, accompanied by four other officers, approached Hernandez, searched him and the car he was about to enter, and found heroin. A later search of the parolee's residence produced more drugs. Appeal from conviction for possession of heroin resulted in an affirmance, although the search was characterized as

of doubtful legality if weighed on the standard scale.

Conceding a parolee possesses *some* constitutional rights, the court found, in essence, they were *diluted* to the point he could not be heard to voice absence of reasonable or probable cause with regard to any other than an oppressive search by his parole supervisor.

Subsequently Hernandez, supra, and several other cases in the same vein were cited, and some briefly analyzed, in United States ex rel. Randazzo v. Follette, D.C., 282 F.Supp. 10. There, however, the court, in effect, *stripped* a parolee of all rights under Amendment 4.

One opinion, looked upon with disfavor in Follette, supra, is United States v. Lewis, D.C., 274 F.Supp. 184. In that case FBI agents, armed with an arrest warrant for violation of parole, apprehended defendant on a public street, took from him a key to his apartment, then went there and effected a search resulting in discovery of a still. In sustaining defendant's motion to suppress, the court held, on a well reasoned basis, the warrantless search, absent consent, was constitutionally impermissible. Significantly the court concluded, at 274 F.Supp. 190: "Since the parole officer has the right to investigate and interrogate a parolee for the purpose of determining whether he is living up to his conditions of parole and the parolee is obligated to respond to questions relating to possible violations of parole, it could be argued that the parolee should have no greater Fourth Amendment rights than he would have in a jailhouse cell. This Court, however, does not believe that a parolee can thus generally be stripped of his Constitutional rights, particularly since the effect of such a holding would be to expose him to self-incrimination and to surrender of his privacy with respect to matters and offenses other than violation of parole. In the present case, for instance, to uphold the search would be to expose him to prosecution and conviction for a new crime. Accord-

ingly, the Court concludes that in the absence of an effective consent to the entry of his apartment, the defendant here was entitled to be protected against such search and seizure under the Fourth Amendment. See United States v. Hallman, 365 F.2d 289 (3d Cir. 1966); Brown v. Kearney, 355 F.2d 199 (5th Cir. 1966); Martin v. United States, 183 F.2d 436 (4th Cir.), cert. denied, 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654 (1950)."

A similar position was adopted in Jackson v. Bishop, D.C., 268 F.Supp. 804, 807, and dissent in People v. Randazzo, 15 N.Y.2d 526, 527, 254 N.Y.S.2d 99, 100, 202 N.E.2d 549, 550.

Furthermore, Hernandez, supra, has not escaped criticism. See 18 Vanderbilt L.Rev. 754, 760.

The foregoing discloses some tribunals, leading to the same result, *strip* a parolee of all Fourth Amendment rights while others *dilute* them. Both of these stands are premised, in large part if not entirely, upon what may best be dscribed as a socio-juristic rationalization, i. e., protection of the public and constructive custody.

Conversely, a parolee's rights, to the extent here relevant, are accorded full validity and recognition by other courts.

We are not persuaded the aforesaid "dilution" or "stripping" approaches are constitutionally sound, reasonable, fair or necessary.

In the first place the "dilution" theory begins and ends nowhere, being at best illusory and evasive.

Demonstrably the court said in People v. Hernandez, supra, loc. cit., 40 Cal.Rptr. 103–104: "At this point we confront authorities theorizing that parole is an act of grace, acceptance of which entails the voluntary surrender or curtailment of constitutional rights. (See Note, 65 Harv.L. Rev. 309 at p. 310, fns. 11, 12.) The rationale is not particularly appealing. It makes constitutional rights dependent upon

a kind of 'contract' in which one side has all the bargaining power. A better doctrine is that the state may not attach unconstitutional conditions to the grant of state privileges. * * *

"* * * Although a parolee is not a prison inmate in the physical sense, he is constructively a prisoner under legal custody of the State * * *. In actual fact he moves about in free society, fettered by the conditions and restrictions of his parole. Thus his status differs somewhat from that of unreleased prisoners. To an extent not necessary to ascertain here, he may be able to assert constitutional guarantees and safeguards against arbitrary or oppressive official action. * * *

"Conceivably, the close scrutiny available to the parole authorities should be restricted to the sphere of parole administration."

On the other hand no court, in advancing the so-called "strip" concept, has as yet voiced any legally acceptable basis upon which to hold a parolee may, ipso facto, be arbitrarily or perfunctorily deprived of *all* Fourth Amendment privileges or immunities.

As heretofore indicated we are satisfied the problem can best be approached by determining not what constitutional rights an individual waives on parole, but rather what constitutional guarantees he may assert.

III. Confining ourselves to seizure of evidence relative to a new and independent criminal action, we believe it fairer and far more realistic that an Iowa State parolee's Fourth Amendment rights, privileges and immunities, be accorded the same recognition as any other person. In fact there is to us no apparent constitutionally adequate or permissible basis upon which to hold otherwise.

That view finds more than minimal support in State ex rel. Dean v. Haubrich, 248 Iowa 978, 983, 83 N.W.2d 451, where this court said: "Because of the form of our Government and the demarcation of governmental functions as between national and state governments, we have a double or dual citizenship. 14 C.J.S., Citizens, section 2, states: 'In the United States there is usually a double or dual citizenship, that is citizenship in the nation and citizenship in the state in which the particular individual resides.' 12 Am.Jur., Constitutional Law, section 451, page 99, states: 'In the Constitution of the United States the word "citizen" is generally, if not always, used in a political sense to designate one who has the rights and privileges of a citizen of a state or of the United States. It is so used in the first section of the Fourteenth Amendment. Under this amendment it is now clear that the inhabitants of a state have a dual citizenship, one a general or national citizenship which is independent of, and separate from, their citizenship of the particular state, and the other a citizenship of the state in which they reside.' As to the citizenship of defendant it was, therefore, dual in nature. His rights as an elector and officeholder were controlled by the Constitution and Statutes of the State of Iowa.

"There are a multitude of citizenship rights which defendant did not lose by his crime: freedom of speech; freedom of religion; pursuit of happiness; rights of property; liberty subject only to the restrictions of his 18 month probation; and many other rights and privileges."

Turning now to our state constitution, Article II, section 5, provides: "No * * person convicted of any infamous crime, shall be entitled to the privileges of an elector." See also section 248.12, Code, 1966.

It therefore follows that upon conviction in this state Teeters, constitutionally, lost only the right to vote or hold public office. And certainly, with the exception of lawful conditions governing conduct while on parole or probation, no more onerous burden could be cast upon him by

any subsequent conditional release from a penal institution.

Despite its ultimate holding, the court in People v. Hernandez, supra, inferentially looked with favor on that concept when it observed, as aforesaid, loc. cit., 40 Cal.Rptr. 103: " * * * the state may not attach unconstitutional conditions to the grant of state privileges."

IV. The recognition we accord constitutional rights in the case at hand is also supported by the fact that in the field of administrative processes *involving health and safety of the people*, Fourth Amendment rights are now fully respected. In that area we need refer only to Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930.

In this case a public health officer demanded right of entry to private premises for purpose of inspection, which was refused. Holding the property owner had exercised a constitutionally recognized privilege, the court overruled Frank v. State of Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed.2d 877, and in so doing said, loc. cit., 387 U.S. 528–529, 87 S.Ct. 1730–1731: "The Fourth Amendment provides that, 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. The Fourth Amendment thus gives concrete expression to a right of the people which 'is basic to a free society.' Wolf v. People of State of Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782. As such, the Fourth Amendment is enforceable against the States through the Fourteenth Amendment.

Ker v. State of California, 374 U.S. 23, 30, 83 S.Ct. 1623, 1628, 10 L.Ed.2d 726.

"Though there has been general agreement as to the fundamental purpose of the Fourth Amendment, translation of the abstract prohibition against 'unreasonable searches and seizures' into workable guidelines for the decision of particular cases is a difficult task which has for many years divided the members of this Court. Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant. (Authorities cited.) As the Court explained in Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436:

"'The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent.'"

V. Finally, the fact that a criminal accused is also a parolee should not, as to a new and separate crime, destroy or diminish constitutional safeguards afforded all people. If convicted, the sentence will be in addition to that previously imposed. So, to permit evidence obtained by an unreasonable search and seizure to be used against a parolee, in the prosecution of a separate post-parole offense, might well serve to deny that individual equal protection of the law. See Amendment 14, United States Constitution; Article II, section 5, Constitution of Iowa, quoted supra; Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 749–750, 21 L.Ed.2d 718; Roberts v. LaVallee, 389 U.S. 40, 42, 88 S.Ct. 194, 196, 19 L.Ed.2d 41; Brown v. Board of Education, 347 U.S. 483,

492–496, 74 S.Ct. 686, 691–692, 98 L.Ed. 873; Jackson v. Bishop, D.C., 268 F.Supp. 804, 807; 16A C.J.S. Constitutional Law § 503, page 300; 16 Am.Jur.2d, Constitutional Law, section 492, page 857; 49 Iowa L.Rev. 945; and 38 N.Y.U.L.Rev. 702–730.

Lending considerable support to the foregoing view is this statement in Talley v. Stephens, D.C., 247 F.Supp. 683, 686: "Although persons convicted of crimes lose many of the rights and privileges of law abiding citizens, it is established by now that they do not lose all of their civil rights, and that the Due Process and Equal Protection Clauses of the 14th Amendment follow them into the prison and protect them there from unconstitutional administrative action on the part of prison authorities carried out under color of State law, custom, or usage. More specifically, prison authorities are not permitted to inflict upon convicts cruel and unusual punishments for violations of prison rules; they may not discriminate invidiously against a prisoner or class of prisoners; and they may not deny to a prisoner reasonable access to the courts to test the validity of his confinement or to secure judicial protection of his constitutional rights. (Authorities cited.)"

█ VI. We must look now to the factual situation here involved to determine reasonableness of the extended search of Teeters' living quarters by Holmes and the Red Oak Police Chief.

Evidence presented in course of the suppression hearing discloses Holmes, absent any warrant, went to Teeters' apartment, not to arrest but rather for the purpose of ascertaining why the latter had not reported for work. The parole supervisor was then aware of the fact there had been some "break-ins" within the area but knew of nothing which even tended to connect the parolee with them.

After gaining entrance, Holmes attempted to open a locked door. Several times Teeters objected with a remark to the effect, something was in there he did not want Holmes to see. The parole supervisor admitted he then became suspicious.

Eventually Holmes entered a bedroom and found in a locked closet some stolen goods which were seized. A new and independent criminal charge was thereupon filed against the parolee.

So, as applied to the matter of the new and independent criminal action, our task is to determine whether Holmes, at the time, had reasonable or probable cause to engage in a warrantless search of Teeters' living quarters.

It has been said "probable cause" relative to a warrantless search, "* · * * exists 'where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'" Ker v. California, 374 U.S. 23, 35, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726.

The State does not contend Holmes went to Teeters' apartment because of information linking the parolee with any theft, or to arrest the latter for having received stolen goods. That means we do not have here an arrest-attendant search.

Furthermore, there can be no question but that the parole supervisor engaged in an exploratory search of the premises. *The arrest followed.* See Dyke v. Taylor Implement Mfg. Co., infra.

Without doubt Holmes acted on nothing more than suspicion, absent any plausible trustworthy facts or information upon which he could reasonably conclude a separate or new offense had been or was being committed by Teeters.

Admittedly the parolee acted suspiciously, but that does not serve as a substitute

for facts or information essential to a warrant absent search.

And it can hardly be contended Holmes acted under any emergency conditions as in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.

In those cases upholding search of a mobile vehicle, it has always been held, officers may lawfully act only on "reasonable or probable cause" to believe they will find instrumentalities of a crime or evidence pertaining to a crime *before* they begin the warrantless exploration. See Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 221, 88 S.Ct. 1472, 1475, 20 L.Ed.2d 538.

It is therefore apparent the pre-search reasonable or probable cause, essential to its validity, was not here present or established.

VII. Moreover, as to the pending stolen goods charge against Teeters, the search clearly went beyond any reasonable reach area.

Even if this had been a warrantless arrest-attendant search, which as aforesaid it was not, Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, would bar evidentiary use of goods seized in the prosecution of the receiving stolen property charge.

In Chimel, supra, police engaged in a search of an entire home without benefit of a warrant. Striking down any evidentiary use of items thus found and seized, the court said at 89 S.Ct. 2043: "The search here went far beyond the petitioner's person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him. There was no constitutional justification, in the absence of a search warrant, for extending the search beyond that area. The scope of the search was, therefore, 'unreasonable' under the Fourth and Fourteenth Amendments and the petitioner's conviction cannot stand."

See also Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728; Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732; and Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

VIII. Finally, the Supreme Court said in Kwong Hai Chew v. Colding, 344 U.S. 590, 596, 73 S.Ct. 472, 477, 97 L.Ed. 576: "It is well established that if an alien is a lawful permanent resident of the United States and remains physically present there, he is a person within the protection of the Fifth Amendment. He may not be deprived of his life, liberty or property without due process of law."

Then in Shaughnessy v. United States, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956, the court, citing Kwong Hai Chew, supra, held that an alien, *even though he has illegally entered our gates* is entitled to all the traditional standards of fairness encompassed in due process of law.

Surely, if an alien, with no citizenship rights, must be accorded due process of law, a citizen's constitutional rights can be neither so diluted nor stripped from him as to eliminate his privilege against unreasonable search and seizure under the Fourth Amendment, merely because he is a parolee.

IX. We conclude, (1) Teeters had standing to request evidentiary suppression of fruits obtained by a search of his home, relative to the prosecution of an offense separate and apart from that upon which he had been previously granted a parole; (2) as to that post-parole criminal charge, the warrantless search was constitutionally proscribed because it, (a) was not premised upon reasonable or probable cause, and (b) was conducted beyond any area reasonably reachable by Teeters at the time.

Trial court correctly sustained Terry Teeters' motion to suppress evidence

seized in the course of a constitutionally proscribed warrantless search.

Writ annulled.

MASON, BECKER, LeGRAND and REES, JJ., concur.

LARSON, STUART and SNELL, JJ., and MOORE, C. J., dissent.

LARSON, Justice (dissenting).

Being unable to understand the majority opinion filed herein, I respectfully dissent. To me the issue is not complicated and does not seriously involve the interpretation and application of the Fourth Amendment to the United States Constitution or any Iowa constitutional provisions.

The issue here is simply whether, in the performance of his duties to oversee and supervise a parolee the parole agent observes stolen or contraband property on the premises occupied by the parolee, he or an assisting officer can seize such goods and testify in regard to them in a criminal prosecution other than for a parole violation. I hold he may do so, and should do so, if the parole system is to be any protection for the community or general public.

Our first inquiry, then, is whether under the law and the facts the parole agent or supervisor was properly on the parolee's premises. The second is whether evidence of a separate criminal offense observed by him while there could be used in a trial of that offense. I believe under this record the agent was there both by consent and under power and authority to examine the premises for any and all parole violations by the defendant Teeters, and that while legally there he observed such evidence and may so testify.

Parolee Teeters had executed the usual instrument to secure his parole. In it inter alia he agreed to conduct himself honestly in all respects, to obey the law, to keep reasonable hours, to refrain from excessive use of intoxicant liquor or beer, and not to go beyond the limits of Montgomery County, Iowa. It appears with the aid of Mr. Holmes, his parole supervisor, Teeters secured employment and living quarters in Red Oak, Iowa.

At approximately 7:30 A. M. on July 26, 1968, Holmes received a telephone call from Teeters' employer stating that Teeters had not reported for work that morning. Since an unexplained absence from work would be a violation of Teeters' parole, Holmes went to his apartment and knocked on the door. He could hear someone inside, but for ten minutes he received no response to his calling and knocking. Finally Teeters opened the door and let him in. The apartment was in shambles with beer cans scattered on the floor. In explaining why he had not reported for work, Teeters told Holmes he had been out late the night before and, in fact, had gone to Pottawattamie County, that there had been "quite a party" when he returned to his apartment, and that he had overslept. Holmes decided it was his duty to check out the entire premises to determine the extent of Teeters' parole violations. He found the door to the bedroom locked and, when Teeters asked him not to open that door "because there was something [he] should not see," Holmes rightfully proceeded to obtain the whole story and learn the extent and seriousness of Teeters' parole violation. It appears Holmes was aware of recent break-ins in Page and Montgomery Counties, and Teeters' extreme nervousness aroused his suspicions as to what a thorough examination of the premises might reveal.

Not being able to open the door to the bedroom, Holmes complied with Teeters' request to get something to quiet his nerves at a local store. He also advised Teeters he would be right back and that if there was something he should not see in that room, now was the time to remove it before he got into more serious trouble.

Holmes then went to the police station, obtained a set of master keys, returned to

the apartment, and attempted to unlock the door. When Teeters obtained a knife from the kitchen and "kind of juggled" it in his hands, Holmes decided he needed help and went to the police station. He asked the chief of police to accompany him to Teeters' apartment "and keep an eye on Mr. Teeters while [he] opened this door." When they returned and started trying various keys, Teeters said he would help them open it, that "he would be glad when the door [was] open and it would be over with." When he indicated which key would fit the lock, Holmes did open the door to the bedroom. He then found the door to the closet locked and opened it with the same key used in the bedroom door. Therein Holmes saw a new color television set with the store tags still on it, two stereo sets, an iron, and a clock radio, later identified as having been taken from a store in Page County. Recognizing this as stolen property, the chief of police duly informed Teeters of his rights and he was taken into custody.

Viewing this record in a light most favorable to defendant, I cannot see how Holmes' acts in performing his duty under the circumstances can be considered an unreasonable infringement on Teeters' rights. Teeters knew of Holmes' duties and was aware of the agreement he signed at the time he accepted the parole. In fact, except to mildly protest, he consented to Holmes' presence in the apartment and helped him conduct his investigation. Never once did he try to stop that investigation or demand that the officers obtain a search warrant. In any event, it cannot be seriously contended that Holmes was not legally upon these premises at the time he observed the stolen goods. Even if consent is doubted, I believe, as Teeters apparently did, that Holmes was legally on the premises performing his duty as a parole officer, and that alone is sufficient basis for his presence at that time.

It has often been held that a granted and accepted parole does not change the status of a prisoner. By the parole the prisoner is not discharged, but is only permitted during good behavior to serve the remainder of his sentence outside the prison walls. A parole simply pushes back the prison walls for the prisoner, allowing him wider mobility and personal opportunity while serving his sentence. State v. Rath, 258 Iowa 568, 573, 139 N.W.2d 468, 471; State v. Byrnes, 260 Iowa 765, 771, 150 N.W.2d 280, 284.

Section 247.9, Code 1966, provides: "All paroled prisoners shall remain, while on parole, in the legal custody of the warden or superintendent and under the control of said board [parole board], and shall be subject, at any time, to be taken into custody and returned to the institution from which they were paroled."

We have recently held such statutory provisions are constitutional and proper. As bearing thereon, see Cole v. Holliday, Iowa, 171 N.W.2d 603, and citations.

In addition to our statutes and decisions pertaining to the rights of one on parole, there are numerous federal decisions which support the view that due to his status a parolee's premises may be searched by a parole agent without a search warrant, especially when he is present, and reasonable cause appears to sustain a belief that the parolee has committed a crime, that the protection afforded by the Fourth Amendment to the United States Constitution is only against unreasonable searches, and that what is reasonable in the case of a parolee is not the same as what is reasonable in the case of one possessed of full civil right. United States ex rel. Randazzo v. Follette, D.C., 282 F.Supp. 10; People v. Triche, 148 Cal.App.2d 198, 306 P.2d 616. In Follette, defendant's parole officer and one or more police detectives searched defendant's apartment while arresting him for parole violation. The search revealed some heroin, which was subsequently introduced into evidence in a state criminal matter stemming from that discovery. The court there upheld the search and seizure, saying at page 13 of 282 F.Supp.: "The Fourth Amendment protection against 'unreasonable searches and seizures' by its

terms extends to one released on parole but in determining whether a search is 'unreasonable' the parole status is a powerful circumstance to be considered. * * * Any search by a parole officer in good faith to determine whether a paroled prisoner is complying with the conditions of his release would in my opinion be reasonable. Such a search could become 'unreasonable' only if made too often or if made at an unreasonable hour or if unreasonably prolonged or for other reasons establishing arbitrary or oppressive conduct by the parole officer." This accords with my view, and under the circumstances here disclosed it cannot be said Holmes' search of Teeters' premises was without just cause or was unreasonable for any other reason.

In People v. Triche, supra, a parole officer had gone to parolee's premises in the course of a surveillance. His warrantless investigation revealed narcotics. The court held, because of the officers' special supervisory and visitatorial powers and duties, the search was reasonable. It said at page 618 of 306 P.2d: "The question whether the search by the parole officer was illegal is largely governed by the special character of the relation between such officer and his parolee, * * *. For the protection of the community as to whose security the parolee constitutes a calculated risk, the parole officer exercises an ubiquitous supervision over him, including broad visitatorial powers. Having constructive custody of his prisoner at all times, there is nothing unreasonable in a parole officer's search of the prisoner's premises where he has reasonable cause to believe that the parole has been breached. * * *"

Certainly no parole officer having observed minor breaches of parole would be performing his duty to the board, the prisoner, and the public, unless he sought out and determined the full extent of the violation being investigated.

The majority, without benefit of factual revelation, extends considerable discussion of cases which concern themselves with what is called "dilution" or "stripping" of a parolee's constitutional rights. They are not in point here, and although I am not in favor of denying a parolee his constitutional rights not affected by his status, I do not feel we are justified in ignoring that status in applying such rights. By doing so, the majority neglects the special relationship of a parolee and the parole officer who must supervise the activities of the prisoner on parole and vouch for his conduct, necessary for community security.

Although attorney generals' opinions are not precedent in this court, I would, because of its reasoning, give serious consideration to an opinion rendered on February 19, 1964, which states in part as follows: "Thus for the purpose of supervision and determining a parolee's rehabilitative progress the parole agent has a legal right, without a search warrant, to demand that the parolee * * * open his room for a search by the parole agent. * * * However, a search of the parolee's room during his absence should only be commenced when the parole agent has reasonable cause to believe that the parolee has breached his parole."

As to the second proposition, it must be conceded under our recent pronouncements that when an officer is lawfully upon a premises and observes illegalities or contraband, he may testify as to that fact in a criminal proceeding related thereto. State v. Moore, Iowa, 156 N.W.2d 890, 893; State v. Peterson, Iowa, 155 N.W.2d 412, 415; State v. Brant, 260 Iowa 758, 763, 150 N.W.2d 621, 625.

To hold here that the parole officer and his aiding officers, who were rightfully on Teeters' premises, could not testify as to what they saw in a criminal prosecution related thereto would be to place blinders upon parole agents, to give parole violators preference to other persons, and to reduce our parole system to a mere rehabilitation program.

I would, therefore, conclude that a parolee has a special status not identical with

other persons, that a parole agent or supervisor has not only the right but the duty to conduct a search of the parolee's premises when he has reason to believe the parolee has been engaged in activities violative of his parole, and that he is not restricted in testifying in another criminal action as to what he observed in his official investigation of the premises. I find no unreasonable search in this case and would hold the trial court erred in sustaining defendant's motion to suppress that evidence. The writ should be sustained.

SNELL, J., joins in this dissent.

STUART, Justice (dissenting).

I respectfully dissent. In my mind the basic question, not answered in the majority opinion, is whether a search by a parole officer in the discharge of his duties of supervision, surveillance and control over the parolee is within "those carefully defined classes of cases" referred to in Camara v. Municipal Court, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930, 935, or the "well recognized exceptions" mentioned in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, in which a search of private property without proper consent or a valid search warrant can be reasonable. I believe this must be the rule if our parole system is to function properly for the benefit of both the society and the individual.

"It has been held that where a parole officer has reason to believe that a parolee has violated the terms of his parole, such officer may lawfully make a search of the parolee's residence prior to taking him into custody." Anno: 89 A.L.R.2d 715, 755 (1963).

"The question whether the search by the parole officer was illegal is largely governed by the special character of the relation between such officer and his parolee, * * *. For the protection of the community as to whose security the parolee constitutes a calculated risk, the parole

officer exercises an ubiquitous supervision over him, including broad visitatorial powers. Having constructive custody of his prisoner at all times, there is nothing unreasonable in a parole officer's search of a prisoner's premises where he has reasonable cause to believe that the parole has been breached." People v. Triche, 148 Cal.App.2d 198, 306 P.2d 616. A long line of California cases including People v. Hernandez, 229 Cal.App.2d 143, 40 Cal. Rptr. 100, 8 A.L.R.3d 1092, cert. den. 381 U.S. 953, 85 S.Ct. 1810, 14 L.Ed.2d 725; People v. Robarge, 151 Cal.App.2d 660, 312 P.2d 70; People v. Denne, 141 Cal.App. 2d 499, 297 P.2d 451; confirm this position.

If the search is valid, fruits of another crime disclosed by such search are properly admissible into evidence along with the testimony of the parole officer.

"The rule applicable here, widely supported by authority, is that if entry of the premises is authorized and the search is valid, the Fourth Amendment does not inhibit the seizure of property the possession of which is a crime, even though the searching officers were not aware such property was on the premises when the search was initiated. Among the articles the possession of which has been declared to be illegal per se and the seizure of which is not within the constitutional guaranty is stolen property. 79 C.J.S. Searches and Seizures § 17, pages 792, 793." State v. Wesson (1967), 260 Iowa 781, 784–785, 150 N.W.2d 284, 286 and cases and authorities cited and discussed therein including Harris v. United States, 331 U.S. 145, 155, 67 S.Ct. 1098, 1103, 91 L.Ed. 1399, 1408, and Abel v. United States, 362 U.S. 217, 238, 80 S.Ct. 683, 697, 4 L.Ed.2d 668, 686.

This case is not controlled by Camara v. Municipal Court, supra. That case merely takes "administrative health and safety inspections" out of the "carefully defined classes". We know of no case and none are cited which hold a parole officer must obtain a search warrant to inspect the premises of a parolee.

Of course, abuse of visitation could amount to harassment and render a search unreasonable under the facts. An unlawful warrantless search by peace officers does not become legal because they are accompanied by a parole officer. But neither of these situations confronts us here.

I would reverse.

MOORE, C. J., and SNELL, J., join in this dissent.