MANSFIELD, Justice
(dissenting).
I join in the dissents of Justice Waterman and Justice ’ Zager, but write separately to respond to the majority’s ten “[ejstablished [pjrinciples of [independent [sjtate [constitutional [l]aw.” As I will attempt to show, these are not established principles. I will respond to the majority’s ten points in order.
1. The majority begins its list of ten principles by asserting that its constitutional approach announced in 2010 has been “thoroughly explored” in a majority *520 opinion released in 2011 and a special concurrence released in 2013. See State v. Baldon, 829 N.W.2d 785, 803 (Iowa 2013) (Appel, J., concurring specially); State v. Pals, 805 N.W.2d 767 (Iowa 2011); State v. Ochoa, 792 N.W.2d 260 (Iowa 2010). That should end the debate, the majority suggests, notwithstanding the clear disconnect between this court’s 2010-2014 approach to search and seizure and the approach it took for decades before 2010.
I respectfully disagree. Actual decisions are binding and can have stare decisis effect, but is a philosophical approach binding? Is a statement by the Iowa Supreme Court in one case that it gives no weight to United States Supreme Court interpretations of the same constitutional language binding for all future cases? I think not. Could four Justices of the Supreme Court bind this court in the future to follow “original intent,” “legal realism,” or “economic analysis of the law”? I doubt it.
Furthermore, the State of Iowa has directly put at issue the approach to be taken in this state constitutional search and seizure case. While the State is not seeking to overturn the Ochoa, Pals, or Baldón decisions today, it has asked this court to give deference to United States Supreme Court precedent. In particular, the State asks this court to follow United States v. Knights, 534 U.S. 112, 122, 122 S.Ct. 587, 593, 151 L.Ed.2d 497, 507 (2001), in which that Court unanimously upheld a probation search similar to the one here. The State concludes in its brief, “Short has failed to produce sufficient justification for this Court to swim upstream against the well-accepted decision in Knights."
Thus, we need to decide whether we give deference to Knights or not. I believe we should.
2. The majority’s second principle is that state constitutions were “the original protectors of individual rights.” Here, all the majority is really saying is that America had states before it had a national government. Of course that is true. But what is the relevance of that point when it comes to interpreting the Iowa Constitution of 1857?
Our state did not come before the United States. We became a state over fifty years after the Federal Bill of Rights was ratified. Our framers adopted article I, section 8, not because it resembled something in some other state’s colonial era constitution, but because it was already the federal constitutional provision. So if timing and sources matter, we should be guided by interpretations of the Fourth Amendment.
3. Principle three is that there was a strong emphasis on individual rights in the Iowa Constitution. To support this contention, the majority cites us to the statements made by George Ells during the debates over the Iowa Constitution. We should look at Elis’s actual words, not the majority’s paraphrasing.
After offering an amendment that was adopted by the convention to include a counterpart to the Due Process Clause in the Iowa Constitution, Ells said:
I am one of that class of men who believe that that clause in the Constitution of the United States, has been violated by the Congress of this nation in such a manner that we would be justified at this time, either by legal enactment or by incorporating provisions into our constitution, in protecting ourselves from its operation. I regard the Fugitive Slave Law as unconstitutional, because it does not give to man the right to defend his life and liberty by “due process of law.” In this opinion, I expect to be at variance with my friend from Lee, [Mr. Johnston,] and those who *521 act with him. Now, the committee who have offered the amendment to this second section, did so from a desire that the Bill of Rights in the Constitution of this State, should be as strong, in this respect, as the Constitution of the United States. We have seen, Mr. Chairman, that Constitution violated again and again by the dominant party in the land, which rides rough-shod over the necks of freemen. In common with a large majority of the people of this State, I desire to see our constitution contain every guarantee for freedom that words can express. If the words “due process of law,” shall in time be recognized by our judicial tribunals to mean what they really do mean, “that no person shall be deprived of life, liberty or property, without a legal proceeding based upon the principles of the common law, and the constitution of the United States”— that every man, when his life or liberty are imperilled, shall have the right to be tried by a jury of his countrymen. Then, sir, that infamous Fugitive Slave Law will become a nullity, and the American people will trample its odious enactments in the dust.
1 The Debates of the Constitutional Convention of the State of Iowa 101-02 (W. Blair Lord rep., 1857) (emphasis added), available at http:/Avww.statelibraryofiowa. org/serviees/collections/law-library/iaconst/ iaconstdebates.
Reading Elis’s statement in its entirety, rather than the majority’s shorthand version, he was clearly urging his colleagues to include a due process clause in the Iowa Constitution so that it would have the same degree of protections against a rampant majority as the United States Constitution provided. He was not proposing a due process clause so that Iowa’s courts could go on future solo missions to find new interpretations of constitutional provisions with established meanings.[28]
McClure v. Owen is another example of the majority’s overenthusiastic reading of nineteenth-century sources. See 26 Iowa 243 (1868). The majority cites McClure as an early recognition that Iowa can “construe state constitutional provisions free from federal precedent.” But McClure had nothing to do with the proposition we are discussing today. The constitutional provisions being interpreted in McClure were Iowa constitutional provisions with no counterpart in the United States Constitution. See id. at 244.
Thus, in McClure, the court noted the United States Supreme Court had refused to follow our court’s most recent interpretation on a' question of the authority of municipal corporations under the Iowa Constitution. Id. at 253 (citing Gelpcke v. City of Dubuque, 68 U.S. 175, 206, 1 Wall. 175, 17 L.Ed. 520, 524 (1863)). This involved Iowa-specific provisions with no parallel in the United States Constitution. See generally Gelpcke, 68 U.S. at 204, 17 L.Ed. at 525 (setting forth provisions of the Iowa Constitution).
Along the same lines, Iowans should justly be proud of several landmark decisions of our court, including Clark v. Board of Directors, 24 Iowa 266 (1868), *522 and Coger v. Northwestern Union Packet Co., 37 Iowa 145 (1873). This court did not decide Clark and Coger, however, by disregarding contemporaneous federal interpretations of counterpart provisions of the United States Constitution. In Clark, this court held a provision of the 1857 Iowa Constitution providing “ ‘for the education of all of the youths of the State through a system of common schools’ ” required a local school board to integrate its schools. 24 Iowa at 271 (quoting Iowa Const, art. IX, div. 1, § 12 (emphasis added)). The Clark court reached this conclusion without citing or discussing any federal precedent or the United States Constitution. See generally id. at 269-77. Nor is our court’s decision in Coger an example of divergence from United States Supreme Court precedent in interpreting a parallel provision of the Iowa Constitution. Coger presciently held that a “woman of color” was entitled to equal accommodations under the Equal Protection Clause of the United States Constitution without finding any broader rights under the Iowa Constitution. See 37 Iowa at 153,155-57. These decisions are rightly hailed today, but they should not be cited as justification for what this court is doing now in search and seizure law.
Also somewhat extravagant, in my view, is the majority’s claim that our framers’ use of a semicolon rather than a comma in article I, section 8 indicates “the framers [of the Iowa Constitution] believed that there was a relationship between the reasonableness clause and the warrant clause.” Let’s review the federal and the Iowa provisions. First, the Fourth Amendment:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV.
Now article I, section 8:
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.
Iowa Const, art. I, § 8.
I do not think one can use this inconsequential punctuation difference to justify a different interpretation of article I, section 8.
Notably, in Ochoa the court merely noted this difference. See 792 N.W.2d at 268-69. Now it elevates this difference into a statement of the 1857 framers’ intent.
4. The majority’s next principle is that the incorporation of federal constitutional guarantees against the states has led to “a tendency for the United States Supreme Court to dilute the substance of the rights.” The Fourth Amendment, in the view of the majority, was watered down once it became incorporated against the states under the Fourteenth Amendment. The majority decries the United States Supreme Court having replaced clear requirements with “vague notions of reasonableness.”
People can decide for themselves whether this court’s recent article I, section 8 decisions have led to greater clarity and predictability. In my view, a rule that would sustain searches based on reasonable suspicion of probationers who consented to such searches as a condition of probation is straightforward and easy to *523 apply. It was sustained unanimously by the United States Supreme Court in Knights. See 534 U.S. at 122, 122 S.Ct. at 593, 151 L.Ed.2d at 507. If Knights resulted in a watering down of constitutional protections, that observation escaped every member of the Supreme Court, including Justices Stevens, Souter, Ginsburg, and Breyer.
And if Knights really involved some deviation from historic Fourth Amendment principles, one would expect some other state court, somewhere, to have voiced disagreement. But the majority cites no example of a state court that has declined to follow Knights under its own constitution. To the contrary, just next door, in State v. Anderson, the Minnesota Supreme Court unanimously declined an invitation to depart from Knights under the Minnesota Constitution. 733 N.W.2d 128, 140 (Minn. 2007).
In this unanimous decision, the Minnesota Supreme Court observed:
The Supreme Court’s decision in Knights does not appear to be a sharp or radical departure from its previous decisions or a retrenchment on its Fourth Amendment jurisprudence with respect to probation searches. Moreover, we are not convinced that federal precedent inadequately protects our citizens’ basic rights and liberties. Accordingly, we decline Anderson’s invitation to deem the search of his residence unreasonable under the Minnesota Constitution.

Id.

Notably, Minnesota’s counterpart to the Fourth Amendment is worded quite similarly to Iowa’s article I, section 8, including the presence of a semicolon between “violated” and “and.” Compare Minn. Const, art. I, § 10, vnth Iowa Const, art. I, § 8.
5. In principle number five, the majority contends that “lockstepping state law to federal precedents is not a humble or minimalist approach, but is an aggressive and maximalist approach to the law.” This is a straw man attack because no member of this court has questioned its authority to independently interpret Iowa’s Constitution. The issue is one of deference — do we exercise our substantial authority “in the search and seizure area with a degree of self-imposed modesty and restraint”? See Baldón, 829 N.W.2d at 843 (Mansfield, J., dissenting).
I do not understand the basis for the viewpoint that we are being “humble” when we reject precedents from the United States Supreme Court and state supreme courts around the country and conclude, by ourselves, that a warrant is always necessary to search a home absent exigent circumstances (or maybe consent).
The logic of the majority’s opinion would also require a warrant before searching the home of a person who is under house arrest. Does that make sense?
The implication of the majority’s position is that one is being “humble” when one finds new constitutional rights and “maximalist” when one does not. This is certainly open to question. In fact, if we look at what transpired, tragically, between In re Ralph, 1 Morris 1 (Iowa 1839), and Dred Scott v. Sanford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857), we have a statutory interpretation of an act of Congress (In re Ralph) being overridden when the act was declared unconstitutional on the ground that it violated some previously undiscovered constitutional interpretation (Dred Scott).
Both cases involved a slave who entered free territory. In In re Ralph, the slave had entered Iowa with the consent of his master, albeit on condition that he pay a certain amount to his master “as the price *524 of his freedom.” 1 Morris at 6. The Supreme Court of the Territory of Iowa, interpreting the Missouri Compromise of 1820, held that because Iowa was a free territory, Ralph became free once he entered Iowa with “the understanding of all parties that the slave was going to become a permanent resident of the free state or territory.” Id.
In Dred Scott, the United States Supreme Court held that Dred Scott could not obtain his freedom, despite the fact that he had been brought by his master into free territory voluntarily and had spent considerable time there. 60 U.S. (19 How.) at 454, 15 L.Ed. at 721. In so ruling, the Court struck down as unconstitutional the same Missouri Compromise on which In re Ralph had relied:
[A]n act of Congress which deprives a citizen of the United States of his liberty or property, merely because he came himself or brought his property into a particular Territory of the United States, and who had committed no of-fence against the laws, could hardly be dignified with the name of due process of law.
[[Image here]]
Upon these considerations, it is the opinion of the court that the act of Congress which prohibited a citizen from holding and owning property of this kind in the territory of the United States north of the line therein mentioned, is not warranted by the Constitution, and is therefore void; and that neither Dred Scott himself, nor any of his family, were made free by being carried into this territory; even if they had been carried there by the owner, with the intention of becoming a permanent resident.
Id. at 450-52,15 L.Ed. at 719-20.
In my view, you can only draw the lesson from In re Ralph and Dred Scott that courts should be constitutional innovators if you disregard what those decisions actually say.
Since the majority accuses the dissenters of utilizing “what Professor Adrian Vermeule refers to as a ‘precommitment device,’” it is worth reading the relevant section of Professor Vermeule’s article. Here it is:
On this picture, free-speech doctrine is partly a judicial precommitment device and partly a prophylactic rule. It is a precommitment device insofar as judges devising free-speech doctrine at time 1 worry that at time 2 their own cognition or decision-making processes will be affected by some overpowering influence. (In the free-speech context, the influence might be the social exigency that provoked the political suppression of speech, or the offensiveness of the speech itself.) So the judges restrict their choices at time 2 by announcing, at time 1, a rule that will prevent their future selves from surrendering to the passions of the moment. It is a prophylactic device insofar as judges choosing free-speech rules at time 1 worry, not about their own future cognition, but about the cognition of other judges deciding future cases, either judges of subordinate courts or future members of the very court that devised the rule at time 1. Here the judges formulate legal doctrine in order to restrict other judges’ future choices.
Adrian Vermeule, The Judicial Power in the State (and Federal) Courts, 2000 Sup. Ct. Rev. 357, 366-67 (2000) (footnotes omitted). I do not know what this verbiage means but I am confident it will not help me in deciding whether the search of Mr. Short’s residence in this case was lawful.
*525 6. Next, the majority contends that there is a “double irony” in giving deference to United States Supreme Court interpretations of the Fourth Amendment. I will begin with the majority’s first irony. The first irony is that at a time when “societies advocate renewal of federalism by returning power to the state, it is ironic that an exception is made for state judicial power.”
I am not aware of any clamoring by society to give judges more power to strike down laws. The federalism movement generally focuses on two goals: (1) restraining the power of the federal government; and (2) giving states a greater ability to decide their own destiny. Expansive, idiosyncratic interpretation of article I, section 8 serves neither goal. As I pointed out in Baldón, federal officials are not bound by article I, section 8, and if the evidence from Short’s house in this case had been used to prosecute Short on a federal charge, he would have no recourse. See Baldón, 829 N.W.2d at 842 (Mansfield, J., dissenting). So, whatever one may say about the majority’s search and seizure jurisprudence, it is not a bulwark against federal power.
Nor is the majority giving Iowans a greater opportunity to choose their own destiny. Rather, it is overriding a determination by Iowa’s elected branches that searches, upon reasonable suspicion of persons who have been sentenced to probation, are an appropriate way to rehabilitate the defendant and protect the community. See, e.g., Iowa Code § 907.6 (2011) (“Probationers are subject to the conditions established by the judicial district department of correctional services subject to the approval of the court, and any additional reasonable conditions which the court or district department may impose to promote rehabilitation of the defendant or protection of the community.”).
The majority’s second irony runs something like this: (1) the United States Supreme Court’s jurisprudence is confusing and not uniform, and (2) the Iowa Supreme Court will be able to straighten things out and provide uniformity. I think this overestimates the wisdom of this court. Justice Scalia, whose observation about “inconsistent jurisprudence” is quoted with approval by the majority, advances the view that we should go back to 1791. See California v. Acevedo, 500 U.S. 565, 583, 111 S.Ct. 1982, 1993, 114 L.Ed.2d 619, 636 (1991) (Scalia, J., concurring in judgment). If a warrant was required for a kind of search then, it should be required for the same kind of search now. One can quibble with that approach, but it is a coherent doctrine. What is the majority’s guiding principle other than a general hostility to warrantless searches?
7. The majority then goes on to say that any lack of uniformity between federal and Iowa search and seizure law “does not create a substantial burden on professional law enforcement.” I question this statement.
I do not agree that all court decisions are perfect and equal. Some court decisions create needless burdens because they have incomplete reasoning, leave questions unanswered, contain unneeded dicta, or threaten to go in a direction without actually going there. No judge should ever assume that applying her or his decision will be an easy task, even for professionals.
But this gets back to my original point. When we choose to follow Federal Fourth Amendment precedent, we are following standards that have already been put into practice around the country. Those decisions have been vetted and not only by their authors. So the unanticipated consequences of those decisions, to a large degree, have already emerged and been ad *526 dressed by subsequent decisions. This is the whole idea of precedent.[29]
When we embark on our own path, we do not know what the consequences will be. For example, will the majority’s ruling in this case lead to fewer grants of probation and a higher rate of incarceration? I do not think the majority knows.
The majority also asserts that its approach will not burden attorneys because the work required to develop state constitutional law arguments is “not overwhelming.” Here, I agree with the majority. Even when the briefs do not contain arguments under the Iowa Constitution, this court has been repeatedly willing to make the arguments for the litigants and decide them. In fact, it almost seems as if a lawyer in this court would be wiser not to develop an Iowa constitutional argument. A litigant who actually writes up an argument generally has to stand or fall on that argument, but a litigant who merely refers to the Iowa Constitution in passing gets the benefit of whatever theory this court decides to develop.
8. The majority’s eighth principle is that it is better not to develop a set of “criteria” for when this court will deviate from federal precedent. The majority says we will simply exercise “our best, independent judgment of the proper parameters of state constitutional commands.”
I respectfully suggest we owe the citizens of the state a bit more than this. We owe them our best independent judgment, to be sure, but that independent judgment should be tempered with respect for those who came before us and grappled with the same issues.
9. The majority’s ninth principle is that when we are dealing with parallel state and federal constitutional provisions and parties do not advocate a separate Iowa constitutional standard, this court will generally apply the standard set forth in federal constitutional caselaw, but reserve the right to do so more stringently. See, e.g., State v. Kooima, 833 N.W.2d 202, 206 (Iowa 2018); State v. Tyler, 830 N.W.2d 288, 291-92 (Iowa 2013). I am puzzled why the majority mentions this alleged principle here because it is not following it today.
Needless to say, this approach, amorphous though it may be, involves at least some degree of deference to federal precedent.
*527 The majority’s Ochoctr-Pals-Baldon approach, however, is different. It gives no weight to federal precedent. According to the majority today, “we reach our decisions independently of federal constitutional analysis.”
Thus, in Ochoa, this court said, “The degree to which we follow United States Supreme Court precedent, or any other precedent, depends solely upon its ability to persuade us with the reasoning of the decision.” 792 N.W.2d at 267. We said so even though the defendant had not urged a separate interpretation of article I, section 8. See Baldón, 829 N.W.2d at 837 (Mansfield, J., dissenting) (noting that Ochoa had not asserted that the state constitutional provision should be interpreted differently than the Fourth Amendment). In Pals, we again said that United States Supreme Court precedent was entitled to no deference, even though the defendant had not urged a different standard. See 805 N.W.2d at 771 (stating the issue presented); see also id. at 784-85 (Waterman, J., dissenting) (noting Pals never argued the Iowa Constitution provided broader protection than the Fourth Amendment).
In summary, if you read Ochoa, Pals, Baldón, and today’s opinion, federal constitutional precedent gets no deference regardless of what the defendant argues. But at other times, even when the case involves article I, section 8, this court generally follows the federal framework in the absence of separate argument. See, e.g., Kooima, 833 N.W.2d at 206; Tyler, 830 N.W.2d at 291-92. Hence, in my view, the majority’s ninth principle undermines the overall concept it is intended to support.
10. In its tenth and final principle, the majority again claims the mantle of precedent for itself. It says that it is simply reaffirming State v. Cline, 617 N.W.2d 277 (Iowa 2000), Ochoa, Pals, and Baldon. I disagree that Cline should be categorized with Ochoa, Pals, and Baldon for reasons I have previously discussed. Baldon, 829 N.W.2d at 838-39 (Mansfield, J., dissenting) {“[Cline] was about remedy, not right.”). Cline observed that the Fourth Amendment and article I, section 8 “are generally deemed to be identical, in scope, import, and purpose” and applied the same analysis under both provisions to the question of whether a violation had occurred. 617 N.W.2d at 281-82 (citation and internal quotation marks omitted).
The tenth principle is really just the first principle making an encore. The majority believes it is settled law (since December 2010) that United States Supreme Court search and seizure decisions are entitled to no more deference than a law review article. I continue to question that proposition and therefore file this dissent.
WATERMAN and ZAGER, JJ., join this dissent.

. The majority notes that "during this time period the United States Supreme Court upheld the Fugitive Slave Law from constitutional attack.” I do not follow where the majority is heading with this point because the United States Supreme Court did not uphold the Fugitive Slave Law until two years after Elis's statement. See Ableman v. Booth, 62 U.S. 506, 526, 21 How. 506, 16 L.Ed. 169, 177 (1859) ("[T]he act of Congress commonly called the fugitive slave law is ... fully authorized by the Constitution of the United States.”). Ells would not have known what the United States Supreme Court was going to do two years after he spoke.

. The majority claims to be following this court’s own precedent of State v. Cullison, 173 N.W.2d 533 (Iowa 1970). At the risk of repeating what my colleagues Justice Waterman and Justice Zager have said in their dissents in the present case and what I said in my Baldón dissent, Cullison was a Fourth Amendment case. It was criticized at the time for being a misapplication of the Fourth Amendment, see J. Richard Bland, Case Note, 19 Drake L.Rev. 481, 481 (1970), and is no longer good law because its view of the Fourth Amendment has been superseded by subsequent United States Supreme Court decisions.
In Ochoa, this court twice acknowledged that Cullison was a Fourth Amendment decision before claiming otherwise at the end of the opinion. First the court said, "[T]his court's decision in [Cullison ] ... held that a parolee did not surrender his Fourth Amendment rights by virtue of his status as a parolee.” Ochoa, 792 N.W.2d at 264. And then the court said, "Rejecting the stripping and diluting approaches, the [Cullison] majority held that a parolee is afforded the same rights as any other person under the Fourth Amendment.” Id. at 286. Toward the end of its opinion the court recharacterized Cullison as having "held that the warrant and probable cause requirements of article I, section 8 are fully applicable to searches of parolees' homes.” Id. at 287.
As noted by Justice Zager, those who would view Cullison as a decision based on article I, section 8 face the considerable obstacle that the decision never mentioned article I, section 8.